597 N.W.2d 430 (1999)
1999 SD 85
In the Matter of W.G., Alleged Abused or Neglected Child.
In the Matter of P.G., Alleged Abused or Neglected Child.
Nos. 20871, 20872.
Supreme Court of South Dakota.
Considered on Briefs June 14, 1999.
Decided July 7, 1999.
George H. Danforth, Huron, for C.G., father.
Beverly J. Katz, Huron, for appellant J.G., mother.
Mark W. Barnett, Atty. Gen., Joan P. Baker, Asst. Atty. Gen., Pierre, for State.
PER CURIAM.
[¶ 1.] Mother and Father appeal from the order terminating their parental rights to their two sons. We affirm.

FACTS
[¶ 2.] Mother and Father are the parents of W.G., age eleven (d.o.b. May 11, 1988) and P.G., age six (d.o.b. January 13, 1993). Department of Social Services (DSS) has worked with this family since 1990 in Huron and in Sioux Falls. Due to W.G.'s eligibility, he and the family also receive ongoing support services from the Adjustment Training Center in Huron and, because of her mental illness, Mother and *431 the family receive continuing services from the Bradford-Leary Center there.
[¶ 3.] Both boys have special needs. W.G. is educationally considered to be in the mentally retarded category. He has attention-deficit and learning disabilities, as well as hyperactivity and developmental delays. He receives individual psychological therapy and peer group therapy for social skills. He is often angry, with much of this anger directed toward his Father. P.G. is very sensitive and easily upset. He is aggressive, difficult to discipline and impulsive. He also shows signs of attention deficit and hyperactivity. Both boys have indicators that they have Adjustment Disorder with Disturbance of Conduct.
[¶ 4.] Mother is forty-four years old and has been diagnosed with schizophrenia and is mildly mentally retarded. She was first hospitalized at the Human Services Center as an adolescent in 1969. She quit school after the 8th grade and at age twenty-five, joined the carnival when it was at the State Fair in her hometown of Huron. She traveled with it to Texas and left the carnival in 1983. She met Father the following year and lived with him until being admitted to the state psychiatric hospital in Texas in 1985. Upon her release from this hospital in 1986, she returned to South Dakota and was readmitted to the state hospital in Yankton. Father followed her here and they married when they learned Mother was pregnant with W.G. Mother has been hospitalized in McKennan Hospital's mental health unit in 1988, 1989 and 1990.
[¶ 5.] Father is a sixty-four-year-old Hispanic man. He quit school in 1954 to join the United States Navy. He was raised with strict discipline and respect for authority and has a strong work ethic. He is a hard worker and good provider but has a long history of alcohol abuse. He was married and divorced twice previously and has raised six other children who are now grown. In 1993, he was convicted of sexual contact with a thirteen-year-old female friend of his niece whom he was babysitting. He had been drinking at the time of the offense and claims no recollection of the events but readily admits it happened if the victim says it did. He served over four years of his seven-year sentence before his release from prison in April 1998.
[¶ 6.] DSS began receiving referrals on the family ten years ago, in January 1989. In August 1989, allegations of neglect of W.G. were substantiated. In January 1990, one and one-half-year-old W.G. was removed from the home when Mother threatened to kill him. He was removed again in July 1990 for the same reason; this time he stayed in foster care for one year. After W.G. returned home, the family moved to Texas and Mother was readmitted to the state mental hospital there. She gave birth to P.G. during this time. The family returned to South Dakota in July 1993 following her release. DSS received referrals of neglect of the children in August and November, 1993, but did not intervene because the family was receiving in-home services from the Adjustment Training Center and the Bradfield-Leary Center in Huron. Mother continued to receive ongoing support from the mental health centers and was taking a different medication (Clorazil) to stabilize her mental illness. This medication has decreased the symptoms of her illness and she has not been hospitalized since 1993. Mother has described it as a "miracle" drug for her although it does make her drowsy. Her drowsiness has a negative effect on her ability to adequately supervise her sons on some occasions.
[¶ 7.] When Father began serving his sentence in 1993, Mother struggled to care for the two boys, with continuing support services from the two Huron agencies. Three referrals filed with DSS in 1994 were unsubstantiated, but in September 1994, Mother asked to have the children placed in foster care so she could admit herself to the Bradfield-Leary Center. DSS received referrals in 1995 and 1996 but did not intervene because of involvement by the two mental health centers. *432 In November 1996, Mother again asked that the children be placed in foster care so she could admit herself to the Bradfield-Leary Center. Two more referrals to DSS in 1997 were not acted upon because of the involvement of the two mental health centers with the family.
[¶ 8.] Eventually, in 1998, DSS received referrals from both these mental health centers about conditions in the home and child neglect. The children were left to wander and were found several times in Lewis Drug Store five blocks from their home, while Mother was home sleeping. Sometimes, then five-year-old P.G. wandered down to the store alone. Mother was unable to make the children stay at home. Despite intensive in-home services from the mental health centers for five years, the following conditions went unabated: head lice, unkempt and unsanitary living conditions, and no structure or supervision for the children. Both boys slept when and where they pleased, and urinated all over the house rather than use the bathroom, specifically anywhere on the carpet and in a bucket kept under the kitchen sink. Constant in-home and hands-on working with Mother and the boys did not improve these conditions.
[¶ 9.] DSS was also concerned about the Father's imminent release from prison and the fact that he had received no treatment for his sexual abuse problems and had not stopped drinking. Father was twice terminated from the prison's sex offender program for "failure to assume responsibility, minimization, justification, rationalization, and overt lying behaviors." Although at least two psychologists evaluated Father and agreed he is not a premeditated sexual predator or a pedophile, one of these psychologists found him to be "at high risk to sexually reoffend and a danger to the community." (emphasis original). Father has a history of sexual promiscuity and adultery; psychologists noted his use of alcohol loosens his already lowered sexual inhibitions. Father admits he has been classified as an alcoholic since 1965 and has been through three alcohol treatment programs since the 1970s, most recently while incarcerated under the sexual contact with a minor conviction. However, he vehemently denies he has a problem with alcohol because he claims he has never missed a day of work due to his drinking. He states he reduced his weekly intake of alcohol from a half gallon of vodka to pints and beers when his attorney told him to stop drinking. His psychologists have also told him to stop drinking.
[¶ 10.] The children were removed from the home and placed in protective custody on April 24, 1998, the day before Father's release from prison. They were adjudicated abused and neglected on August 13, 1998. The three entities continued providing services to the family. The Family Service Agreement between DSS and the family set forth the following goals and objectives: assure that parents provide proper supervision to the children at all times, maintain clean and healthy home environment, and complete all court-ordered evaluations. These were the identified risk factors that placed the children in danger resulting in their removal. The agreement stated that if the identified risks were not reduced, termination of parental rights was a possibility.
[¶ 11.] Since Father has been home and the children removed, the home has been significantly cleaner. The court ordered supervised visitation, which was held in a variety of places to provide the parents with different experiences in supervising the children. About a month after Father's release from prison, he acquired full-time work laying natural gas pipeline in the state. This work often requires his absence from the home for a week at a time. Although some of the visitations were scheduled on the weekend to accommodate Father's work schedule, many of them occurred during the week without Father's presence. Visitation occurred about once per week though there was no limit on the number of visits parents could have.
*433 [¶ 12.] There is a strong bond between Mother and both boys, but Mother is not able to successfully supervise the children consistently. For example, she fell asleep when they were fighting at McDonald's Playland and appeared not to hear and ignored their fighting and name-calling at home though the boys continued with increasing volume. The record shows P.G. is becoming increasingly more active, aggressive and defiant and Mother is unable to control him.
[¶ 13.] There is significantly less of a bond between W.G. and Father. W.G. ignores Father and withdraws and appears angry during visitation when Father is present. He is much more animated when the visit is only with Mother. P.G., who was less than one year old when Father went to prison, goes to Father more readily but is also more defiant with his Father. Father's response is to yell and shake P.G. when he misbehaves. Father ignored the DSS worker when she tried to intervene, appearing not to know she was present. Father has also told the boys on several occasions that it is their fault they are not at home because they wandered off, that if they cannot behave they cannot come home, and that Father will "call the lawyers" and stop the visitation if they cannot behave. This continued despite DSS workers advising both parents and the boys separately that this is wrong.
[¶ 14.] On November 16, 1998, the trial court issued its memorandum opinion that termination of the parental rights would be in the best interests of the children. A termination order was filed December 14, 1998. Parents appeal.

ANALYSIS AND DECISION
[¶ 15.] 1. Whether the trial court erred in finding by clear and convincing evidence that DSS made reasonable efforts to reunite the family.
[¶ 16.] Parents argue reasonable efforts to reunite the family were not made by DSS and specifically, that they were not provided appropriate parenting instruction. They claim the only service provided them was supervised visitation. What is reasonable is defined by the individual circumstances of each case. In re T.H., 396 N.W.2d 145, 148 (S.D.1986).
[¶ 17.] Parenting instruction was provided by DSS and workers from the Adjustment Training Center and Bradford-Leary Center who supervised the family visitations. It was provided on an informal and as-needed basis depending upon the situation that arose during the visit. During these visits, the supervising worker remained in the background to let the parents parent their children but intervened when necessary for the children's safety and after allowing parents the opportunity to correct the situation first. The record shows instruction was given most often before or after the visit and out of the presence of the children so as not to undermine parental authority with the boys. Instruction was repeated and provided at a level appropriate for Mother to understand by using concrete examples, visual aides, and verbal instruction. Everyone who worked with the family was aware of Mother's limited cognitive abilities. Mother also completed parenting instruction on her own initiative in two more formalized programs. Instruction on a more limited basis was also given Father who refused to accept it.
[¶ 18.] However, the circumstances with this family would not improve with additional parenting instruction. Mother is unable to provide adequate supervision now and in the near future. A psychologist concluded in the court-ordered evaluation that she clearly cannot parent W.G. and P.G. without Father's support as the boys become adolescents and teenagers. Father, at age sixty-four, was not believed by the trial court to be able or willing to change his parenting style, having been raised himself and having raised two previous families in a strict authoritarian style. He rejected instruction that blaming the boys for their removal was not appropriate. *434 Whether true or not, he told the DSS worker that his attorney agreed with him that "all those boys need is a good, hard spanking." Moreover, he is not willing to quit drinking alcohol, which psychologists testified significantly reduced his parenting abilities.
[¶ 19.] This is a case of one parent being unable to properly parent her children alone and the other parent being unwilling to provide proper parenting support. As the boys grow older, they need more than Mother and Father are able and willing to provide. It was not shown that any amount or variety of services would change these facts. "Where efforts to aid or counsel parents by the use of social services proves unavailing, termination of parental rights is justified." In re T.L.J., 303 N.W.2d 800, 806 (S.D.1981). The trial court's finding that efforts made to reunite this family were reasonable was not clearly erroneous.
[¶ 20.] 2. Whether the trial court was clearly erroneous in finding that the evidence supporting termination was clear and convincing.
[¶ 21.] The trial court found Mother unable to parent alone and Father not willing to provide the proper parenting support. Mother specifically was unable to set limits and maintain proper supervision of the boys. Father's presence in the home cannot make up for Mother's inadequacies so long as Father continues to drink and is a perceived threat to sexually reoffend. Father also demonstrated an unwillingness to change his parenting style to one governed by more realistic notions of the children's capabilities and needs. The court found there were no signs that the situation was likely to change in the near future. This is certainly not the same situation found in In re L.A., 507 N.W.2d 83 (S.D.1993) which parents cite to support their argument (termination was not the least restrictive alternative where evidence showed Father was committed to the welfare of his children and was making positive changes in his life, and visitations with his children, the only service offered, were successful).
[¶ 22.] The best interests of the children must always prevail. In re S.A.H., 537 N.W.2d 1, 5 (S.D.1995). Here, both children have documented special needs that cannot be met at home as well as needing the permanency and stability that all children require and deserve. In re Z.Z., 494 N.W.2d 608, 610 (S.D.1992). There is clear and convincing evidence in the record to support the trial court's decision to terminate parental rights.
[¶ 23.] 3. Whether DSS violated the Americans with Disabilities Act.
[¶ 24.] This issue was not raised before the trial court and is therefore waived on appeal. Knudson v. Hess, 1996 SD 137, ¶ 8, 556 N.W.2d 73, 75; Klinker v. Beach, 1996 SD 56, ¶ 17, n.3, 547 N.W.2d 572, 576.
[¶ 25.] Affirmed.
[¶ 26.] MILLER, Chief Justice, and SABERS, AMUNDSON, KONENKAMP, and GILBERTSON, Justices, participating.