2002 SD 15

**Timothy D. MELDRUM, Sr., Individually and as the biological parent and natural guardian of T.D.M., Jr., Plaintiff and Appellee,**

v.

**Charles NOVOTNY, Defendant and Appellant,**

**T.D.M., Jr., Intervenor and Appellant.**

**No. 21995.**

Supreme Court of South Dakota.

Argued Oct. 3, 2001.

Decided Jan. 30, 2002.

J.M. Grossenburg, Winner, for plaintiff and appellee.

Sandy J. Steffen of Johnson, Eklund, Nicholson, Peterson & Fox, Gregory, for defendant and appellant.

Steven R. Smith of Andera & Smith Law Offices, Chamberlain, for intervenor and appellant.

SABERS, Justice.

[¶ 1.]  **Justice Richard W. Sabers delivers the majority opinion of the Court on Issue 1, which holds that the trial court did not err in determining that Meldrum was fit to have custody of T.D.M.**

[¶ 2.]  **Justice Sabers delivers the majority opinion of the Court on Issue 2, which holds that the trial court did not err in determining that Meldrum did not abandon T.D.M.**

[¶ 3.]  **The separate writings of Chief Justice Gilbertson, Justice Konenkamp and Justice Amundson control Issue 3, and result in a remand to the trial court for a determination of the best interest of the child.**

[¶ 4.]  **SABERS, Justice, writing the majority on Issues 1 and 2.**

[¶ 5.]  Timothy Meldrum, Sr., (Meldrum) the biological father of T.D.M., filed a writ of habeas corpus seeking custody of his son, T.D.M. Charles Novotny (Novotny) countered for custody of T.D.M. The trial court awarded custody to Meldrum. Novotny appeals on the ground that Meldrum is unfit.  T.D.M. appeals on the grounds that he was abandoned by Meldrum and that extraordinary circumstances exist to defeat Meldrum's parental preference.  We affirm.

### FACTS

[¶ 6.]  Timothy Meldrum, Sr., and Nancy Meldrum were married in Rock County, Illinois, on June 9, 1988.  They had one son, T.D.M., who was born on October 9, 1988.  In 1990, Nancy began working as an exotic dancer.  Her appearances required her to travel away from home.  During Nancy's absences, T.D.M. stayed with his father.

[¶ 7.]  One of Nancy's appearances took her to Winner, South Dakota.  While in Winner, Nancy met Novotny, a local

rancher. Prior to T.D.M.'s fourth birthday in 1991, Nancy and Novotny began living together.

[¶ 8.] In 1992, Nancy took T.D.M. with her to Winner. Meldrum did not contest this arrangement and believed his son would be well cared for. Meldrum remained in Illinois. When Nancy returned to Illinois for dancing appearances, she took T.D.M. to visit his father. Meldrum's extended family, his mother, father, and several aunts, also saw T.D.M. on some of these occasions. This extended family sent letters and cards to T.D.M. after he moved to South Dakota.

[¶ 9.] Nancy and Novotny had one son, Z.N., born on August 3, 1993. When Nancy would travel for dancing appearances, Novotny, with the assistance of his mother, cared for both T.D.M. and Z.N. Novotny provided much of the daily care for the two children, including medical and educational needs.

[¶ 10.] In 1995, a dispute arose between Novotny and Nancy. Novotny sought custody of both T.D.M. and Z.N. On December 26, 1995, Circuit Judge Kathleen Trandahl granted Novotny temporary physical custody of T.D.M. and Z.N., subject to reasonable visitation in Nancy. This was done despite an affidavit filed by Meldrum, who was not a party to the action, seeking custody of both children. The custody proceeding was not pursued.

[¶ 11.] In December 1997, Nancy obtained a divorce from Meldrum. She received physical custody of T.D.M., subject to reasonable visitation in Meldrum. Meldrum was ordered to pay $130.00 per month in child support. Nancy refused the support payments.

[¶ 12.] Meldrum has since remarried and has two children with his second wife. Nancy and Novotny never married. Nancy was killed in a car accident on May 3, 1998.

[¶ 13.] Within two months of Nancy's death, on June 16, 1998, Meldrum filed an application for writ of habeas corpus seeking custody of T.D.M. Novotny countered for custody of T.D.M. The matter was scheduled for trial on August 12, 1998. Custody was awarded to Meldrum. Novotny appealed the award and in 1999 the South Dakota Supreme Court remanded the case for a new trial based on the trial court's failure to appoint an attorney for T.D.M.

[¶ 14.] A new trial was scheduled for March 13, 2000. In March 2000, T.D.M.'s attorney filed a motion to terminate Meldrum's parental rights alleging that Meldrum had abandoned T.D.M. On March 13, 2000, the trial judge continued the case based upon a stipulation of the parties providing for visitation in Meldrum. On January 3, 2001, the trial court set a new trial date for March 29, 2001.

[¶ 15.] At trial, Meldrum presented testimony that he had never abandoned T.D.M. He testified that Novotny prevented T.D.M. from having contact with him and that he did not want to make life difficult for either Nancy or T.D.M. Meldrum also testified that his attempts to provide child support for T.D.M. were refused by Nancy. Other witness testimony claimed that Meldrum was a caring man and a good provider.

[¶ 16.] At trial, Novotny presented testimony that T.D.M. had lived with Novotny for the majority of his life and that he was primarily responsible for T.D.M.'s support and care. Novotny provided other testimony that indicated T.D.M. referred to Novotny as his father and neither thought of nor referred to Meldrum in this way. Novotny attempted to establish that it was in T.D.M.'s best interest to remain with him in South Dakota.

[¶ 17.] At the conclusion of the trial on June 4, 2001, the court awarded custody to Meldrum and granted Novotny visitation with T.D.M. from June 1, 2002, to August 1, 2002, and each year thereafter during T.D.M.'s minority. The trial court concluded that Meldrum was not an unfit parent and neither Novotny nor T.D.M. had shown such extraordinary circumstances as would defeat Meldrum's parental preference under South Dakota law.

## STANDARD OF REVIEW

[¶ 18.] This Court's standard for reviewing findings of fact is well established. "The findings of the trial court will not be set aside unless they are clearly erroneous." *Langerman v. Langerman,* 336 N.W.2d 669, 670 (S.D.1983). In reviewing findings of fact, this Court "must give due regard to the opportunity of the trial court to judge the credibility of witnesses and to weigh their testimony properly." *Id.* The trial court's findings will not be disturbed unless this Court is "firmly and definitely convinced a mistake has been made." *Jasper v. Smith,* 540 N.W.2d 399, 401 (S.D.1995).

[¶ 19.] **1. WHETHER THE TRIAL COURT ERRED IN DETERMINING THAT MELDRUM WAS FIT TO HAVE CUSTODY OF T.D.M.**

[¶ 20.] Novotny argues that the trial court erred in awarding custody of T.D.M. to Meldrum because he is unfit. This Court has recognized that:

The law presumes that the best interests and welfare of a minor will be best served by awarding its custody to the parent and the burden is upon those who claim otherwise to overcome such presumption by clear and satisfactory proof of abandonment or forfeiture or a legal surrender or unfitness of the parent to have custody.

*Guardianship of Sedelmeier,* 491 N.W.2d 86, 87 (S.D.1992) (quoting *Sweeney v. Joneson,* 75 S.D. 213, 216, 63 N.W.2d 249, 251 (1954)). This Court has further recognized that "[i]n legal contests between a parent and a nonparent for the custody of a child the threshold question is: Is the parent unfit to have the custody of the child? ... Without unfitness being established, there is no necessity to look to the best interest of the child." *Sedelmeier,* 491 N.W.2d at 87. There must be "a clear showing against the parent of 'gross misconduct or unfitness, or of other extraordinary circumstances affecting the welfare of the child' [ ], and an award cannot be made to [nonparents] simply because they may be better custodians." *Quinn v. Mouw-Quinn,* 1996 SD 103, ¶ 35, 552 N.W.2d 843, 848 (Amundson, J., dissenting) (citing *Blow v. Lottman,* 75 S.D. 127, 59 N.W.2d 825 (1953), *overruled on other grounds by* Termination of Parental Rights P.A.M., 505 N.W.2d 395 (S.D.1993)). *See also Langerman,* 336 N.W.2d at 670 (holding that grandmother was not entitled to custody of grandchild simply because she may have been a better caretaker than child's biological father).

[¶ 21.] This Court has held that the definition of "unfitness" should be interpreted broadly. *Blow,* 59 N.W.2d at 827.

A parent's disqualification results not only from a lack of ability but also from an unwillingness or from an indifferent lack of desire, as well, to rear a child spiritually, morally, mentally and physically according to the minimum standard the law condones. Thus, unfitness would follow from voluntary conduct bearing on a parent's cruelty, morals, extreme neglect, abandonment or any attitude or condition, created through marriage or otherwise, resulting in home surroundings below the minimum standards; and unfitness would also result

from involuntary circumstances such as extreme poverty, physical or mental infirmity, or any other condition making it impossible for the parent to care for the child according to the minimum requirements.

*Id.*

[¶ 22.] The burden was upon Novotny to show by clear and satisfactory proof that Meldrum was unfit in order to defeat an award of custody to Meldrum. Novotny asserts that Meldrum was unwilling to parent T.D.M. He claims that Meldrum's failure to pay child support, lack of communication with T.D.M., and failure to request visitation, support a finding of unfitness.

[¶ 23.] The trial court, however, concluded that Novotny failed to make the appropriate showing to establish unfitness. In its findings of fact, the trial court stated:

> Based on the evidence, the Court finds that Meldrum is a fit and proper person to have the care, custody and control of T.D.M. Meldrum is married, has two additional children, has a good job and lives in proximity to many of his family members. From the testimony, his home is suitable.

The trial court also stated that "Novotny has prevented Meldrum from giving T.D.M. proper parental care" and "attempted to acquire superior rights to T.D.M. by withholding T.D.M. from his father." The trial court further concluded that Nancy had refused the child support payments initially offered by Meldrum. Novotny has failed to make a clear showing against Meldrum of unfitness affecting the welfare of T.D.M.[1] Therefore, the trial court's findings are not clearly erroneous.

In the absence of such a showing of unfitness, there is no basis for disturbing Meldrum's right to custody.

**[¶ 24.] 2. WHETHER THE TRIAL COURT ERRED IN DETERMINING THAT MELDRUM DID NOT ABANDON T.D.M.**

[¶ 25.] Novotny and T.D.M. also argue that the presumption of custody can be overcome by proof of abandonment. Novotny and T.D.M. assert that Meldrum's actions of not paying child support and having little contact with T.D.M. constitute abandonment.

[¶ 26.] Abandonment is defined in SDCL 25-7-17. SDCL 25-7-17 provides:

> Proof of abandonment or desertion of a child by a parent, or the omission by a parent to furnish necessary food, clothing, shelter, medical attendance, other remedial care, or other means of support for his child is prima facie evidence that the abandonment, desertion or omission is intentional and without lawful excuse.

This Court's standard for determining abandonment is well established. *Claymore v. Serr*, 405 N.W.2d 650 (S.D.1987) (holding that even though the father was lacking in the area of parental support and responsibility, he had not abandoned his child).

> To constitute abandonment under our code it must appear by clear and convincing evidence that there has been by the parents a giving-up or total desertion of the minor child. In other words, there must be shown an absolute relinquishment of the custody and control of the minor and thus the laying aside by

---

1. A very disturbing argument against Meldrum on both fitness and abandonment is that, despite the temporary order entered on December 26, 1995, granting Novotny physical custody over T.D.M., with visitation in Nancy, Meldrum did not initiate any activity to assert custody over T.D.M. until after Nancy's death in 1998.

the parents of all care for it. There must be a showing of an intent on the part of the parent to abandon and to relinquish parental obligations; this intention may be inferred from conduct. *Id.* at 655 (internal citations omitted).

[¶ 27.] The trial court held that:

[T.D.M.] was not abandoned by [Meldrum] because father did not maintain contact with the child. [Meldrum] was intimidated by [Novotny] and did not wish to cause trouble for the child or Nancy Meldrum.

[T.D.M.] was not abandoned by [Meldrum] because father did not pay child support. [Meldrum] was told by Nancy Meldrum, mother of the child, that she did not want child support.

[¶ 28.] The evidence at trial supports the trial court's findings. There has been no showing by Novotny that Meldrum intended to abandon or desert T.D.M. In fact, despite footnote 1, within two months of Nancy's death in 1998, Meldrum filed an application for habeas corpus seeking custody of T.D.M. Such an action is wholly inconsistent with an intent to abandon a child. Furthermore, even while the contact between T.D.M. and Meldrum and Meldrum's family may have been somewhat limited, there was some contact and visitation. There is no sufficient showing that Meldrum abandoned T.D.M.

[¶ 29.] Novotny and T.D.M. have failed to show by clear and satisfactory proof that Meldrum is unfit or that he abandoned T.D.M. The trial court's findings on this issue are not clearly erroneous.

2. **The result of the writings of Chief Justice Gilbertson, Justices Konenkamp and Amundson is to** "remand for a determination on the best interest of the child." However, this has already been determined. The burden was on the appellants to make a sufficient showing that extraordinary circumstances existed. They failed to make a sufficient showing on

[¶ 30.] GILBERTSON, Chief Justice, and AMUNDSON, KONENKAMP and MILLER, Acting Justice, concur.

[¶ 31.] MILLER, Acting Justice, sitting for GORS, Circuit Judge, Acting Supreme Court Justice, disqualified.

[¶ 32.] **SABERS, Justice, writing on Issue 3, with MILLER, Acting Justice concurring, would hold that insufficient extraordinary circumstances exist to require that custody of T.D.M. be awarded to Novotny.**

[¶ 33.] **3. WHETHER EXTRAORDINARY CIRCUMSTANCES EXIST IN THE BEST INTEREST OF THE CHILD REQUIRING THAT CUSTODY OF T.D.M. BE AWARDED TO NOVOTNY.**

[¶ 34.] T.D.M. also argues that sufficient extraordinary circumstances exist in the best interest of the child requiring that custody of T.D.M. be awarded to Novotny. A showing of extraordinary circumstances affecting the welfare of the child may defeat parental preference under South Dakota law. *See Quinn,* 1996 SD 103, ¶ 35, 552 N.W.2d at 848 (citations omitted). However, we have reviewed this argument and the authorities set forth by the parties and conclude that there is no showing of extraordinary circumstances requiring that the findings of fact and conclusions of law set forth in issues 1 and 2 are clearly erroneous or that custody of T.D.M. should be awarded to Novotny.[2]

the best interest of the child for the long-term. The trial court determined this and it has not been shown to be in error.

If we reverse here, we open the floodgates to revenge, boyfriends, neighbors and ex-neighbors, babysitters and would-be foster parents. We should affirm.

[¶ 35.] For all of these reasons, we should affirm the trial court.

[¶ 36.] **The result of Issue 3, which is to remand to the trial court to determine the best interest of the child is controlled by the separate opinions of Chief Justice Gilbertson, Justice Konenkamp and Justice Amundson.**

[¶ 37.] **GILBERTSON, Chief Justice, writing on Issue 3.**

■ [¶ 38.] If one were to poll the judges of this state as to what type of case is the most difficult to decide, a substantial portion, if not all of them, would respond that it is in the area of child custody. It is this issue that established King Solomon as one of the wisest of the ancients. Unlike the case before Solomon, however, both Meldrum and Novotny love T.D.M., making the task before this trial court even more difficult. The trial courts of this state decide these difficult issues by applying general principles of law found in our constitutions and statutes. They, like this Court, do not possess a roving license to do good as they see it.

[¶ 39.] I concur in issues One and Two of this case. I feel, however, that this Court, as well as the trial court, failed to give sufficient attention to T.D.M.'s and Novotny's claim of exceptional circumstances. The record establishes the existence of exceptional circumstances and the case should therefore be remanded to determine what is in the best interests of T.D.M. Neither the trial court nor this Court reached this question.

[¶ 40.] T.D.M. has Attention Defect Hyperactive Disorder (ADHD).[3] Both sides acknowledge that he has ADHD. However, their views regarding the significance of the condition and how to deal with it, are substantially different. Both sides further agree that T.D.M. "is a bright boy." But ADHD does not effect a person's amount of intelligence. Rather, it affects how a person is able to learn and what difficulties must be overcome to maximize the learning process and make full use of the effected person's intelligence. T.D.M. must learn to live with a medical condition that will significantly effect the balance of his life.

[¶ 41.] Joann Haffield, T.D.M.'s elementary school counselor in Winner, where T.D.M. attended, described the general effect of ADHD on T.D.M.'s mind. "It's as though you have a Ping–Pong ball in your head and its bouncing around all the time." This constitutes a permanent

---

**3.** The definitions of ADHD appear to be a description of its characteristics. ADHD results in selective attention, distractibility, impulsivity and hyperactivity. Sears and Thompson, *The ADD Book* 8 (1998). "Most professionals now believe that ADHD consists of three primary problems in a person's ability to control behavior: (1) difficulties in sustained attention, (2) impulse control or inhibition, and (3) excessive activity. Some researchers ... would add the additional problems of: (4) difficulty following rules and instructions, and (5) the presence of excessive variability in response to many situations, especially schoolwork." Martin, *The Attention Deficit Child* 21 (1998).

Behavioral characteristics of ADHD include high activity levels, impulsivity and lack of self-control, difficulty with transitions and changing activities, aggressive behavior, easily overstimulated, social immaturity, low self-esteem and high frustration. However, not all symptoms apply to each child and symptoms may vary in degree. "Each child is unique and displays a different combination of behaviors, strengths, weaknesses, interests, talents and skills." Rief, *How to Reach and Teach ADD/ADHD Children* 2–3 (1993). Despite these difficulties, children and adults with ADHD are often of high intelligence and can excel if properly motivated and educated. Individuals who are in the "ADD Hall of Fame" include Mozart, Sir Winston Churchill and Thomas Edison. Sears, *supra* at 4.

and major distraction for a child with ADHD when he attempts to learn. Haffield further testified that "[T.D.M.] is very very intelligent [but] he's a compulsive young man and so the structure needs to be provided for him to help control that. . . ." The key to successful education for a child with ADHD is through as much structure as possible throughout the learning process, both in school and at home. This structure helps overcome the distractions to learning that ADHD creates in T.D.M.'s mind.[4] The condition is also treated in part by medication. T.D.M. takes Ritalin for this condition.

[¶ 42.] Obviously, how the ADHD child is raised and educated will effect the amount of learning acquired and the life skills taken into adulthood when he or she attempts to enter a profession and live an independent life. Beyond how much they know, people with ADHD are more compulsive if they have not had proper training and education. Haffield testified this greater compulsion could make them more vulnerable to become delinquents, alcoholics, or drug abusers.

[¶ 43.] Novotny recognized that T.D.M. had difficulties that led to a diagnosis of ADHD by University Physicians in Sioux Falls. He then sought help by reading books on the subject and entering a support group. He provided, in his home, the stability a child with ADHD needs. The trial transcript is replete with examples of how Novotny attempted to structure and guide T.D.M. to overcome the ADHD. He ensured that the Winner School District, both at elementary and higher levels, were aware of T.D.M.'s condition and were providing an educational program to maximize his learning process. Novotny would stop by the school and regularly visit with T.D.M.'s teachers to see if Novotny needed to be providing additional help with homework. Novotny continuously monitored T.D.M.'s educational process.

[¶ 44.] These concepts were all previously recognized by those familiar with ADHD, yet they are concepts that do not appear in the record to have been substantially considered by Meldrum. Both Tim Meldrum Sr. and his wife, Barbara, are familiar with ADHD because another family member has it. They have read articles and taken a class on the subject. Curiously, even though they are actively seeking T.D.M.'s custody, they have made no concrete plans on how to get a proper counselor to deal with ADHD. Further, when asked about T.D.M.'s need for taking Ritalin, Barbara Meldrum testified "I don't think that's a problem here." T.D.M.'s counselors, teachers, other professionals and lay witnesses testified as to the extensive specialized treatment needed for T.D.M.'s education. Yet Meldrum's mother testified "I don't see [T.D.M.] having a big problem with it. I know ADHD kids

---

4. Haffield testified:
   Well, based on the—on the behaviors when they're a small child one of the things that you have to do as a parent or guardian or person that's in charge of the child is to teach them that they must structure or plan what they're going to do and say—and choose things to do small sections at a time. Like, okay, [T.D.M.], if you have—if you have math to do let's not worry about three pages, let's do this one thing. Also, when you're planning an activity what can I do within this amount of time and accomplish it in that time and then finish the other part later.
   And so if they learn to do these small things when they're younger and they learn to understand when they're losing control, when—when they've lost concentration to pull back and regroup, so to speak, then hopefully these skills are going to transfer into their adulthood. They'll choose vocations. They'll make the kind of choices that they need to do to compensate with ADHD because they know they suffer from it.

and I don't see these things in [T.D.M.] that I see in these other kids."

[¶ 45.] The effect ADHD has had on T.D.M. cannot be viewed in isolation. Testimony from non-parties to the action establishes T.D.M. has been very emotionally effected by the death of his mother and a grandparent. T.D.M. has also developed a close bond with Novotny, as well as T.D.M.'s half-brother Zach, who lives with Novotny and is his son.

[¶ 46.] Although South Dakota recognizes the doctrine of exceptional circumstances, we have not had the issue analyzed by this Court in detail. Other jurisdictions, however, recognize the exceptional circumstances doctrine and have applied it in cases with factual settings similar to this one.

[¶ 47.] In *William L. v. Betty T.*, 243 A.D.2d 860, 663 N.Y.S.2d 324 (N.Y.App. Div.1997), the court affirmed a determination that the natural father was not suitable for placement of his children due to extraordinary circumstances. The court based its decision on the father's extended lack of custody of the children, together with the custodians' successful treatment of the children's Attention Defect Disorder, mental retardation, and other special needs. Similarly, in *Banks v. Banks*, 285 A.D.2d 686, 726 N.Y.S.2d 795 (N.Y.App. Div.2001), the court held that the special needs of an older child and the parent's failure to address these problems, while petitioner had arranged for counseling, constituted extraordinary circumstances. The court in *Smith v. Pond*, 5 Va.App. 161, 360 S.E.2d 885 (1987), also concluded that medical history and treatment can constitute extraordinary circumstances, which would justify taking a child from the natural parents, if the parents were unable or unwilling to provide adequate medical care to meet the special needs.

[¶ 48.] Overriding parental preference, when extraordinary circumstances are present, does not offend the Constitution. In *Price v. Howard*, 346 N.C. 68, 484 S.E.2d 528 (1997), the court examined the doctrine of extraordinary circumstances against the applicable constitutional standards which have been addressed herein by this Court. The *Price* court concluded:

> A natural parent's constitutionally protected paramount interest in the companionship, custody, care, and control of his or her child is a counterpart of the parental responsibilities the parent has assumed and is based on a presumption that he or she will act in the best interest of the child. Therefore, the parent may no longer enjoy a paramount status if his or her conduct is inconsistent with this presumption or if he or she fails to shoulder the responsibilities that are attendant to rearing a child. . . . [C]onduct inconsistent with the parent's protected status, which need not rise to the statutory level warranting termination of parental rights, would result in application of the "best interest of the child" test without offending the Due Process Clause. Unfitness, neglect, and abandonment clearly constitute conduct inconsistent with the protected status parents may enjoy. Other types of conduct, which must be viewed on a case-by-case basis, can also rise to this level so as to be inconsistent with the protected status of natural parents. Where such conduct is properly found by the trier of fact, based on evidence in the record, custody should be determined by the "best interest of the child" test mandated by statute.

*Id.* at 534–35 (internal citations omitted).

[¶ 49.] The above facts with regard to T.D.M., Novotny and the Meldrums are uncontested. The trial court's findings of

fact are correct, as far as they go. However, very little attention was paid to T.D.M.'s ADHD. The trial court properly treated the doctrine of extraordinary circumstances as a conclusion of law, but then erred as a matter of law by concluding T.D.M.'s ADHD and its surrounding uncontested facts did not constitute extraordinary circumstances for the purposes of determining custody.[5] Upon a *de novo* review of the applicable law and uncontested underlying facts, I would reverse the trial court on its refusal to apply the doctrine of extraordinary circumstances.

[¶ 50.] As per *Sedelmeier*, 491 N.W.2d 86, I would remand to the trial court for a determination of what custody arrangement is in the best interests of T.D.M. That determination should include comprehensive home studies of both households which, to date, have not been done.[6] The question of what is in the best interests of the child was never reached by the trial court because it does not become a consideration until the non-parent prevails, either on the claim of parental unfitness or extraordinary circumstances. *Id.* at 87. T.D.M. and Novotny should prevail on the extraordinary circumstances issue. As a result, the best interests of the child test now becomes applicable and should determine with whom T.D.M. resides, visitation and other relevant matters.

[¶ 51.] In summary, I concur on issues One and Two and would reverse and remand on issue Three.

[¶ 52.] **KONENKAMP, Justice, writing on Issue 3.**

KONENKAMP, Justice (concurring in part and concurring in remand for a best interests determination).

**A.**

[¶ 53.] I concur with the conference opinion on Issues One and Two. Insufficient evidence of parental unfitness exists in this record. As for abandonment, if Meldrum abandoned his child, it was primarily to the mother, not to the mother's boyfriend. But that does not end our inquiry. On Issue Three, this case must be remanded to allow Novotny to seek guardianship of T.D.M.

**B.**

[¶ 54.] A guardianship proceeding affords an established mechanism for considering claims by nonparents for the custody of children. It ensures principled decision-making, with some measure of certainty and predictability in this difficult and complex area. Our guardianship laws were rewritten in 1993, creating the new South Dakota Guardianship and Conservatorship Act. With this enactment, our Legislature implemented a more expansive and protective approach toward the special needs of children.[7] Among other things, this law allows for the separation, if necessary, of caretaking and money management functions.

---

5. In an interesting contrast, the trial court made a conclusion of law that extraordinary circumstances did exist for the purposes of visitation between T.D.M. and Novotny. In ordering such visitation, the trial court relied upon *Mouw–Quinn*, 1996 SD 103, 552 N.W.2d 843. This has not been appealed by Meldrums.

6. The transfer of T.D.M.'s custody from Novotny to Meldrum took place this summer. This would allow timely home studies of both residences in a setting where T.D.M. has recently lived, or is currently living.

7. Two statutory avenues are available for nonparents to obtain custody of a child in South Dakota, one is through the abuse and neglect laws, SDCL ch. 26–88, and the other is through the Guardianship and Conservatorship Act, SDCL ch. 29A–5. *Crouse v. Crouse*, 552 N.W.2d 413, 418 (S.D.1996).

[¶ 55.] Most important, as part of the revisions, the parental preference statute in our former guardianship law was repealed. *See* SDCL 30–27–23 (repealed 1993). There still exists a constitutional preference for fit parents, of course. The natural parent-child relationship is a protected fundamental right. *See Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599, 606 (1982). Yet, children are not property. They have rights of their own. Courts are beginning to recognize that "a child has an independent, constitutionally guaranteed right to maintain contact with a person with whom the child has developed a parent-like relationship." *Webster v. Ryan*, 189 Misc.2d 86, 729 N.Y.S.2d 315, 316, 331 (N.Y.Fam. Ct.2001) (addressing right to visitation). Our new guardianship laws give greater impetus to these rights.

[¶ 56.] Under South Dakota's guardianship laws, both the person seeking guardianship and the child for whom guardianship is sought have a voice in how the matter should be decided. SDCL 29A–5–203 provides:

> [A] petition for the appointment of a guardian, a conservator, or both, may be filed by ... an interested relative, by the individual or facility that is responsible for or has assumed responsibility for the minor's care or custody, by the individual or anyone the minor has nominated as guardian or conservator, or by any other interested person, including the department of human services or the department of social services.

Certainly, Novotny is an "individual ... [who] has assumed responsibility for the minor's care or custody...." In a guardianship proceeding, a court must consider "the suitability of the proposed guardian or conservator, the minor's current or proposed living arrangements, ... the availability of less restrictive alternatives, the extent to which it is necessary to protect the minor from neglect, exploitation, or abuse, and if applicable, the minor's need for habilitation or therapeutic treatment." SDCL 29A–5–208. Moreover, under our guardianship laws, a court "shall" consider "the wishes of the minor if the minor is of sufficient age to form an intelligent preference." SDCL 29A–5–202. *See also* SDCL 29A–5–304 (nominating or appointing guardian or conservator). The word "shall" in our statutes "manifests a mandatory directive," conferring no discretion. SDCL 2–14–2.1.

[¶ 57.] Nonetheless, as we have said in several cases, before custody may be transferred to a nonparent, the parents must be proved unfit or there must exist extraordinary circumstances reflecting on some serious detriment to the child. In *Cooper v. Merkel*, we wrote:

> Before a parent's right to custody over his or her own children will be disturbed in favor of a nonparent a clear showing against the parent of gross misconduct or unfitness, or other extraordinary circumstance affecting the welfare of the child is required, and an award cannot be made to [nonparents] simply because they may be better custodians.

470 N.W.2d 253, 255 (S.D.1991) (internal quotation omitted). Although abandonment and unfitness were not proved, the record contains considerable evidence of extraordinary circumstances.

[¶ 58.] We have never before defined the term "extraordinary circumstances." Several other jurisdictions, however, have identified the extraordinary circumstances sufficient to overcome the constitutional parental preference. These circumstances must be only those that result in serious detriment to the child. They include the abandonment or persistent neglect of the child by the parent; the likelihood of serious physical or emotional harm to the child

if placed in the parent's custody; the extended, unjustifiable absence of parental custody; the abdication of parental responsibilities; the provision of the child's physical, emotional, and other needs by persons other than the parent over a significant period of time; the existence of a bonded relationship between the child and the nonparent custodian sufficient to cause significant emotional harm to the child in the event of a change in custody; the substantial enhancement of the child's well-being while under the care of the nonparent; the extent of the parent's delay in seeking to reacquire custody of the child; the demonstrated quality of the parent's commitment to raising the child; the likely degree of stability and security in the child's future with the parent; the extent to which the child's right to an education would be impaired while in the custody of the parent; and any other circumstances that would substantially and adversely impact the welfare of the child. *See Locklin v. Duka,* 112 Nev. 1489, 929 P.2d 930, 934–35 (1996); *In the Matter of the Guardianship of Jenae K.S.,* 196 Wis.2d 16, 539 N.W.2d 104, 106 (Wis.Ct.App.1995); *Burrows v. Sanders,* 99 Md.App. 69, 635 A.2d 82, 85 (Spec.App.1994); *Ross v. Hoffman,* 280 Md. 172, 372 A.2d 582, 593 (1977); *Bennett v. Jeffreys,* 40 N.Y.2d 543, 387 N.Y.S.2d 821, 356 N.E.2d 277 (1976).

[¶ 59.] Substantial extraordinary circumstances exist in this case. The record contains uncontradicted expert testimony that a permanent return of custody to the father would cause serious emotional detriment. The child has been in Novotny's custody for more than eight years. Much of that time the father acquiesced in the situation. There were many years where there was no contact between father and son. Even after the temporary order of December 26, 1995, granting Novotny physical custody of the child as against the mother, the father did not initiate any

legal action to assert his right to custody until after the mother's death in 1998. The child has a strong attachment to Novotny. He also has a strong attachment to his half-sibling in Novotny's home. The child has maintained a consistent desire to remain with Novotny. The circuit court concluded that there were no extraordinary circumstances. That was clearly erroneous. The court must consider these vital issues on remand.

## C.

[¶ 60.] Consistent with South Dakota law, a two-part test must be met before a court can grant custodial guardianship to a nonparent. Once extraordinary circumstances have been shown, then the best interests of the child must be considered. The circuit court never reached the question of the child's best interests. In finding that there was no abandonment or extraordinary circumstance, the court held that Novotny obstructed Meldrum's visitation and contact with his son. Yet this is only one factor in many to consider and balance in a best interests determination. *Fuerstenberg v. Fuerstenberg,* 1999 SD 35, 591 N.W.2d 798. Furthermore, because T.D.M. has been living with his father in Illinois during the pendency of this appeal, the circuit court may wish to hear additional evidence on the child's progress with his father.

[¶ 61.] Courts must never lightly intrude upon family integrity. The family relationship remains intrinsic to our religious, cultural, social, and economic substance. Even between loving parents, deciding who will maintain custody of a child will always be an onerous task. In most instances, when family integrity fails, we still depend on parental commitment to the child. But when even that breaks down, we must resort to some established legal process to prevent children from being

buffeted by demands having little to do with their best interests. South Dakota's guardianship process addresses the circumstances we face in this case. Parents have rights, of course, but children have rights as well, rights to care, stability, and love.

[¶ 62.] **AMUNDSON, Justice, writing on Issue 3.**

AMUNDSON, Justice (concurring specially).

[¶ 63.] Because I believe the best interest of the child should always be paramount, I would reverse and remand for a determination of this issue.[8]

[¶ 64.] A child's welfare should be of utmost importance, even when evaluating a custody battle between a parent and non-parent. There is a plethora of cases in this state placing "the best interest of the child" on a pedestal above all other considerations in custody battles. *See, e.g., In re W.G.,* 1999 SD 85, ¶ 22, 597 N.W.2d 430, 434 (stating "[t]he best interest of the children must always prevail."); *Zepeda v. Zepeda,* 2001 SD 101, ¶ 13, 632 N.W.2d 48, 53 (stating "our brightest beacon remains the best interest of the child"). We should place the child's interest upon such a pedestal in all custody cases, decreasing the emphasis on the fitness of the parent when a non-parent seeks custody. *Cf. In re Guardianship of Sedelmeier,* 491 N.W.2d 86, 87 (S.D.1992) (holding that unfitness of parent must be established before the best interest of the child can be addressed in a parent versus non-parent custody battle).

[¶ 65.] Although I do not disagree with a presumption of custodial entitlement on behalf of a biological parent, one should be able to trump that presumption with the best interest of the child. "[T]he welfare of the child is superior to the claim of the parent so that the right of the natural parent must yield where it clearly appears that the child's welfare requires that custody be granted to another." *Doe v. Doe,* 92 Misc.2d 184, 399 N.Y.S.2d 977, 982 (N.Y.Sup.Ct.1977). If a child develops a secure, stable and continuing parent-child relationship with a third party who has become a psychological parent, then "the presumption that, absent extraordinary circumstances, a child should be in the custody of the natural parent should be rebuttable." *Id. See also, Fisher v. Fisher,* 99 Nev. 762, 670 P.2d 572, 573 (1983) (stating that a growing number of cases focus on the best interest of the child, and citing *Doe, supra,* approvingly). Also, in the case of *In re Paternity of L.K.T.,* 665 N.E.2d 910 (Ind.Ct.App.1996), the Indiana Court of Appeals was involved in a custody dispute between a parent and non-parent, and stated as follows:

> In *Turpen v. Turpen,* 537 N.E.2d 537 (Ind.Ct.App.1989), this court rejected the "mechanical approach" ... in evaluating evidence in custody actions. The *Turpen* court recognized that preeminent in the court's consideration is the best interest of the child, and that there might be reasons for preferring a non-parent over a parent ... This view, i.e., preeminence of the child's best interest over other considerations, was impliedly reaffirmed in *Atteberry v. Atteberry,* 597 N.E.2d 355 (Ind.App.1992): 'Our law clearly prefers to consider the best interest of the child over the presumption that custody must be in a natural parent.' *Id.* (other citations omitted).

---

8. We acknowledged this point in *Meldrum v. Novotny (Meldrum I),* 1999 SD 127, 599 N.W.2d 651, by remanding so that appointed counsel could represent the child's best inter- est. In fact, we stated that the best interest of the child is "our brightest beacon" at "every stage in child custody proceedings" in *Meldrum I. Id.* at ¶ 10 (internal citations omitted).

*Id.* at 912. I submit that South Dakota should also place the best interest of the child as the paramount factor in this type of custody dispute so that the presumption of custody for a natural parent is subordinate to the child's best interest.

[¶ 66.] The case at hand did not involve the traditional "Leave It To Beaver" family where mom, dad and kids all ate supper together under the same roof each evening. In this case, the biological father was not living with his biological son. Importantly, the traditional "Cleaver" family is becoming less and less common in contemporary society. As society changes, some of our laws become antiquated and fail to provide just results. If a child's best interest is with a non-parent, we should not permit outdated laws to prohibit such conduct.

> This concept, of psychological parent-child relationship, has gained increasingly greater acceptance in the courts where the phenomena has been observed at close hand and where psychiatric experts have testified to its being well grounded. Where a psychological parent-child relationship has developed, disruption of this relationship can be even more traumatic and devastating on occasion than severing the tie with a natural parent.

*Doe*, 399 N.Y.S.2d at 982 (internal citations omitted). Thus, our custody laws should adapt to our changing social situations. A biological parent should not be deemed the proper custodian simply because they are a biological parent; rather, we must place our emphasis on what is best for the child.

[¶ 67.] This writing should not be interpreted as approving any conduct by the psychological parent, such as having the minor child on national television, having television cameras present at the time the child was transferred, or any other manipulative acts which cannot be construed as being in the best interest of the child. Therefore, this type of conduct is still to be considered by the trial court when determining what is in the best interest of the child.

[¶ 68.] In this case, the minor child has been thrust into an environment not necessarily of his choosing based on the conduct of the parents and Novotny. Therefore, I would remand for a determination on the best interest of the child so that this critical decision is not the mechanical act of plugging a peg in the right hole.