2004 SD 128

**The PEOPLE of the State of South Dakota in the Interest of L.N., JR., Minor Child, and Concerning M.C.N., Respondent.**

No. 23029.

Supreme Court of South Dakota.

Argued Oct. 4, 2004.

Decided Dec. 1, 2004.

Lawrence E. Long, Attorney General, Ann M. Holzhauser, Assistant Attorney General, Pierre, South Dakota, Attorneys for appellee.

Douglas N. Papendick, Stiles & Papendick, Mitchell, South Dakota, Attorneys for appellant.

GILBERTSON, Chief Justice.

[¶ 1.] M.N. (mother) appeals the termination of her parental rights over her seven-year-old son, L.N. Jr. (child). We affirm.

### FACTS

[¶ 2.] Mother, age 31, is originally from Miller and spent time growing up in Tulare, Iroquois and Huron. As a young adult, she lived in Huron. During the course of the abuse and neglect proceedings involving child, she moved to Mitchell. Mother has a long history of mental illness which has, at times, been exacerbated by alcohol and controlled substance abuse. Mother first became pregnant when she was in tenth grade and married the father. Marital difficulties arose, the couple divorced, and custody of the child was awarded to the father with mother relinquishing her parental rights.

[¶ 3.] Mother had a poor employment record as a young adult in Huron and was unable to hold jobs as a dishwasher and housekeeper. She also began drinking and using marijuana and ended up in a chemical dependency treatment program at the Human Services Center in Yankton.

[¶ 4.] Mother returned to Huron and was able to live on Social Security disability and on other assistance programs. She

eventually met L.N. Sr. (father) and married for the second time. Child was born to the couple in 1996, but mother's mental problems resulted in child's placement in foster care over three different time periods. In January 1997 mother voluntarily placed child in foster care because she was unable to care for child and needed to seek treatment for her depression and to stabilize her medications. Child remained in foster care for sixty days. Child was voluntarily placed in foster care for the second time in February 2000 as a result of mother's hospitalization at a mental health center in Huron. Child remained in foster care for thirty days. Child was placed in foster care a third time in April 2001 when mother again became unstable mentally and emotionally and the Department of Social Services (DSS) substantiated mother's neglect in leaving child unsupervised while she was passed out on medication. Child remained in foster care until October 2001.

[¶ 5.] In between the periods of time child spent in foster care, DSS also investigated various referrals for abuse and/or neglect of child. In 1998 mother completed an assessment and received services in response to concerns over her supervision of child and meeting his physical needs. In July 2000 an investigation substantiated physical abuse and neglect of child. In October 2000 an investigation indicated neglect and mother was required to clean her house and take parenting classes. In February 2001 an investigation indicated neglect by mother in not picking child up after school. In March 2001 an investigation again substantiated neglect by mother.

[¶ 6.] The third placement of child in foster care in April 2001 resulted in the commencement of abuse and neglect proceedings in Beadle County. Child was adjudicated abused and neglected in May and father voluntarily terminated his parental rights. Mother completed a case service plan in which she participated in a home-based program, completed parenting classes and a psychological evaluation, cooperated with counseling and took her medications consistently. Over the course of the plan, mother moved from Huron to Mitchell where she received services through Dakota Mental Health Center. Mother received individual counseling and medication-management services and child also received individual and family counseling services and medication-management services.

[¶ 7.] Mother's problems persisted even after her move to Mitchell and the return of child to her care in October 2001. Mother lived with a boyfriend, T.E., and there were frequent arguments and instances of domestic violence in the home. There were also concerns with mother's supervision of child and that child was allowed to roam in the community unattended or supervised by acquaintances of questionable capability. Reports of a number of such incidents are contained in the settled record. At one point, mother herself indicated to a therapist that child, then five, would get on his bike and run around town all day long and that she did not know where he was.

[¶ 8.] By early 2002 mother's mental state was again beginning to unravel. In March she had a manic attack, refused to take her medication, drank alcohol and wrote some $600 worth of bad checks. In June mother was seen by an on-call therapist because she was threatening suicide. In August mother was hospitalized after fighting with her boyfriend and not taking her medication for two days. In September mother reported to her mental health center that she was going to the Human Services Center in Yankton, but then did not make the trip.

[¶ 9.] Events culminated on October 17, 2002. Mother's boyfriend called the police for assistance with mother and mother told the investigating officer that she was afraid to be alone and was thinking about committing suicide. Mother voluntarily committed herself for treatment at Sioux Valley Hospital in Sioux Falls and child was taken into protective custody and placed in foster care.

[¶ 10.] Child was never returned to the home, but mother was eventually permitted supervised visitations with child. A petition alleging abuse and neglect of child was filed on October 23, 2002 and mother admitted to the petition in December. The dispositional hearing was held in June 2003 and the trial court subsequently entered findings of fact, conclusions of law and an order terminating mother's parental rights. Mother appeals.

## ISSUE

[¶ 11.] **Was the trial court clearly erroneous in finding that termination of mother's parental rights was the least restrictive dispositional alternative?**

[¶ 12.] Mother argues that the trial court erred in finding that termination of her parental rights was the least restrictive alternative. Our standard of review of this argument is well-settled.

The trial court may terminate parental rights if it is in the best interest of the child and if termination is the least restrictive alternative available. The best interest of the child must be viewed from the child's, rather than the [parents'], perspective. We reverse only if the trial court was clearly erroneous in finding that termination was the least restrictive alternative.

*People ex rel. D.T.*, 2003 SD 88, ¶ 18, 667 N.W.2d 694, 699—700 (citations omitted).

[¶ 13.] The parties' respective positions as to error in the finding concerning the least restrictive alternative are represented by two competing psychological evaluations of mother contained in the settled record. One evaluation was performed at mother's behest in May/June 2003 by Dr. Matthew Christiansen, and one was performed by Dr. Frank Dame in June 2001 in connection with the earlier abuse and neglect proceedings. The doctors essentially agreed on mother's diagnosis. Dr. Dame diagnosed a major depressive disorder, recurrent; bipolar type 2 disorder; provisional alcohol dependence; borderline IQ and borderline personality disorder. Dr. Christiansen diagnosed bipolar disorder with recent episodes mixed; borderline personality disorder and borderline intellectual functioning. Based upon mother's statement that she had not consumed alcohol for a number of years, Dr. Christiansen disagreed with Dr. Dame's diagnosis of alcohol dependence. However, Dr. Christiansen conceded that he had not assessed mother's substance abuse thoroughly and that further evaluation in that area would be helpful.

[¶ 14.] Dr. Christiansen made the following recommendation concerning the 2003 disposition of child:

Records indicated that [mother] has demonstrated an improved ability to control her anger and mood in general, as well as manage her symptoms of bipolar disorder within the last eight months. Considering her progress to date, it may be worthwhile to explore placing her son ... in her custody, with clearly stipulated conditions for maintaining custody. [Mother] has participated in therapy and medication management services which may have increased her ability to address her problems appropriately and respond to other vicissitudes of life. [Mother] may

better be able to care for her son if she understands what is required of her to maintain him in her custody; additionally, [mother] should be informed of the possible consequences for her choices. [Mother's] history suggests that continued contact with her mental health professionals may facilitate her ability to parent effectively.

[¶ 15.] In contrast, two years earlier Dr. Dame recommended the termination of mother's parental rights. His recommendation provided in pertinent part:

While [mother] cares greatly for her child, she lacks the emotional stability to consistently put the needs of the child first. In fact, it is common for [mother] to derive her own personal meaning in life, through her role as parent. Unfortunately, this places extreme pressures on the minor child, as he is often made responsible for himself and [mother] as well. He is already very angry about the quality of life he has and the unpredictable behavior of his birth mother. The poor prognosis for improvement suggests that the problems she has experienced in parenting her youngest son are likely to continue and to significantly and permanently damage the child's development or maturation.

It is the opinion of this examiner that [mother] is severely and persistently mentally ill and is as a result unable to properly parent and provide for her minor child. *She is likely to continue experiencing psychiatric crises that disrupt her relationship with the child and which are likely to be damaging to him.*

It is therefore my recommendation that the parental rights be terminated and that Department of Social Services personnel engage in permanency planning for this minor child immediately. (emphasis added).

Notwithstanding Dr. Dame's recommendation, the trial court did in 2001 what Dr. Christiansen advocated that the court do yet again in 2003. It returned child to mother's care. Within a year, the very result foreseen by Dr. Dame came to pass and mother again experienced a psychiatric crisis that required child's removal from the home on an emergency basis.

[¶ 16.] A review of the record makes clear that, as concluded by Dr. Dame, mother's problems are cyclical. She is able to function adequately as a parent for periods of time until the pressures of day to day life and, particularly, her poor choices in personal relationships and child's own psychological problems [1] begin to overwhelm her. At that point, she again suffers a relapse and breakdown. While the DSS worker overseeing mother's case confirmed that mother was stable at the time of the dispositional hearing, she expressed concern for the future. As the worker summarized the problem:

I think [mother] can show that she can improve her life and make good choices, can follow doctor recommendations for a time; under Child Protection supervision and case management, I think she does well, but I believe when we step out of the picture and she's not involved in the court system or has any supervi-

---

1. Child has attention deficit hyperactivity disorder (ADHD) and takes medication for the problem. Behavioral problems of those who suffer from ADHD are outlined in *Meldrum v. Novotny*, 2002 SD 15 n. 3, 640 N.W.2d 460, 466 (Gilbertson, C.J. writing on Issue 3). "The key to successful education for a child with ADHD is through as much structure as possible throughout the learning process, both in school and at home. This structure helps overcome the distractions to learning that ADHD creates in [the child's] mind." *Id.* at ¶ 41, 640 N.W.2d at 467. Obviously such structure was lacking here, lending further credence to the Dame recommendation.

sion by a social worker, she will back out of the counseling or medication management and not take her medication when she's supposed to or will skip a few days, and that's when she starts going back downhill and her son's needs aren't being met.

[¶ 17.] These views are entirely consistent with the record in this case and the 2001 diagnosis offered by Dr. Dame. Certainly the trial court could have accepted Dr. Christiansen's later recommendation and tried placing child back in the home yet again. However, Dr. Christiansen was not entirely familiar with the history of services received by mother and acknowledged that the focus of his evaluation was on mother and not necessarily what was in child's best interests. Moreover, other than the Christiansen recommendation, the record offered no basis to believe that a different result would occur should child be returned to mother's care. The DSS worker testified that no services remained that had not already been tried and that, because of mother's poor record of supervising child, someone would have to be with her twenty-four hours a day seven days a week to make sure child's needs were being met. The worker did not know of any services that could provide mother with that kind of supervision.

[¶ 18.] This record supports the trial court's findings that reasonable efforts were made to prevent or eliminate the need for child's removal from the home and to make child's return home possible; that requiring child to wait further would

not have any likelihood of changing mother's ability to provide for child and his needs; that there was little likelihood that the deficiencies in the home would be remedied; and, that mother would not be able to meet child's needs. Although these findings do not quote verbatim the language in SDCL 26–8A–26 outlining the predicate findings necessary to support a termination of parental rights, they are sufficiently analogous to support the termination in this case.[2]

[¶ 19.] Based upon this record and the foregoing findings, we cannot state that the trial court was clearly erroneous in its ultimate finding that termination of mother's parental rights was the least restrictive alternative. Although mother complains of a lack of services, the record contains a timeline of services provided to mother at least as far back as 2001 that included therapy, psychiatric and psychological evaluations, counseling services, parenting classes, home-based programs, and medication management and supervision. Mother also complains of a denial of increased visitations with child, however the denial coincided with DSS's decision to seek termination of mother's parental rights and termination proceedings were delayed in part to permit mother to procure the psychiatric evaluation from Dr. Christiansen that ultimately proved beneficial to her.

[¶ 20.] This is an unfortunate case where an incapable parent was given multiple opportunities to succeed in developing adequate parenting skills and failed in

---

2. SDCL 26–8A–26 provides in pertinent part: If an adjudicated, abused, or neglected child whose parental rights have not been terminated has been in the custody of the Department of Social Services and it appears at a dispositional or review hearing that all reasonable efforts have been made to rehabilitate the family, that the conditions which led to the removal of the child still exist, and there is little likelihood that those conditions will be remedied so the child can be returned to the custody of the child's parents, the court shall affirmatively find that good cause exists for termination of the parental rights of the child's parents and the court shall enter an order terminating parental rights.

each instance. Obviously the time came for the trial court to determine that child could no longer wait for mother to develop her parenting skills. *See D.T., supra* (courts will .not force child to wait for parents to acquire parenting skills they may never develop). Thus, its finding concerning the least restrictive dispositional alternative is not clearly erroneous.

[¶ 21.] Affirmed.

[¶ 22.] SABERS, KONENKAMP, ZINTER and MEIERHENRY, Justices, concur.