#26195-rev & rem-SLZ

**2012 S.D. 86**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

DOUG VELDHEER and
KARI VELDHEER,                                Plaintiffs and Appellees,

        v.

ANGELA PETERSON,                              Defendant and Appellee,

and

JERED MANDEL,                                 Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
DAVISON COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE SEAN M. O'BRIEN
Judge

\* \* \* \*

TRESSA L. ZAHRBOCK KOOL
Sioux Falls, South Dakota                     Attorney for plaintiffs
                                              and appellees, Veldheers.


DONNA L. BUCHER of
Tinan, Smith & Bucher
Mitchell, South Dakota                        Attorneys for defendant
                                              and appellee, Peterson.

DAVA A. WERMERS
Mitchell, South Dakota                        Attorney for defendant
                                              and appellant, Mandel.

\* \* \* \*

ARGUED OCTOBER 1, 2012

OPINION FILED **12/05/12**

#26195

ZINTER, Justice

[¶1.]     Maternal grandparents were permitted to join/intervene in a custody dispute between the parents of two minor children.  After a three-day trial, the circuit court awarded custody to the grandparents and visitation to the father.  Father appeals the grandparents' joinder/intervention, the award of custody, and the denial of his request for attorney's fees.  We affirm the joinder/intervention; reverse the custody award; and remand for findings of fact, conclusions of law, and reconsideration of the issue of attorney's fees.

*Facts and Procedural History*

[¶2.]     Jered Mandel (Father) and Angela Peterson (Mother) had a four-year relationship.  They never married, but had two children: P.D.M., born December 29, 2005, and P.J.M., born January 18, 2007.  Mother, Father, and the children lived in Mitchell, in a house owned by Father.

[¶3.]     Mother stayed at home and both parents cared for the children when Father was not working.  The parents and children lived together until January 2008 when the parents separated.  Father continued to live in the home and Mother moved into an apartment.  After the separation, Mother and Father shared custody of the children.  However, due to a deterioration of the parents' relationship, difficulties with communication, conflicting work schedules, and financial struggles, the parents began to increasingly rely on the Veldheers, the children's maternal

-1-

grandparents (Grandparents),[1] to care for the children. Following an October 2007 incident between Mother and Father in which Mother was charged with domestic violence-simple assault, the parents asked Grandparents to watch the children for a period of two to three weeks so that the parents could work on their relationship. In 2008, the parents began to rely on Grandparents to serve as the children's primary caretakers.

[¶4.]      In July 2008, Mother obtained sole legal and physical custody of the children as a part of a child support proceeding. The children, however, continued to reside with Grandparents. Grandparents and the children spent the summer of 2008 in Piedmont.[2] Parents took the children back into their care for a brief period in the fall of 2008. However, for the remainder of 2008, for 2009,[3] and until September 2010, Grandparents served as the children's primary caretakers. Father maintained that he wanted to see the children more often, but claimed that he was prohibited from doing so by Grandparents. Father testified: "I wanted the kids, and it was out of my control. I was told I didn't have any custody."[4]

---

1.    Keri Veldheer is Angela Peterson's mother. Doug Veldheer is Angela's stepfather. For ease of reference, we refer to Doug and Kari Veldheer as the maternal grandparents.

2.    Grandparents owned businesses in both the Black Hills and Mitchell.

3.    In 2009, Mother and Father gave Grandparents a power of attorney to make medical decisions regarding the children. Father testified that the power of attorney was given because Grandparents took the children on a trip outside the country.

4.    Although Mother and Grandparents dispute Father's assertion, Father had no visitation rights under the July 2008 order. Father's first court ordered custody/visitation rights were awarded under the September 2010 order.

[¶5.] In January 2009, Grandparents began keeping track of the time Mother and Father spent with the children. In 2009, Father had the children in his care on an average of two days every month. In addition, the children spent what equated to almost a full month of 2009 with their paternal grandparents. In 2010, up until the month of September, Father spent an average of three days a month with the children. Father testified that when he did not see the children he tried to contact them by phone at least once a week.

[¶6.] On at least one occasion, the parties discussed Grandparents becoming the children's guardians. Grandparents testified that they initially discussed a guardianship because the children's Medicaid coverage lapsed. Father testified that he was pressured to agree to a guardianship but he declined. When Father declined, Grandparents said they dropped the subject. Yet later, Grandparents claim that Father approached them about a guardianship. Grandparents had guardianship documents prepared, and although Mother signed them, Father would not. In July 2010, Grandparents, through their attorney, requested Father to consent to a guardianship or take the children back into his care. Father then filed a motion in circuit court to obtain custody of the children.

[¶7.] In September 2010, the circuit court considered Father's motion and awarded Mother and Father temporary joint physical custody on an alternating weekly basis. During Father's weeks, the children stayed with Father in his home. Typically, Father did not work during those weeks. During Mother's weeks, the children stayed with Grandparents. Mother lived in Sioux Falls and saw the children when she traveled to Mitchell. Father had custody of the children under

this order for ten months—the time between the temporary custody award in September 2010 and the permanent custody trial in August 2011.

[¶8.]	Prior to the permanent custody trial, Grandparents filed a separate custody action and moved to join the parents' custody action.  The circuit court granted the motion to join, effectively allowing Grandparents to intervene in the parents' custody dispute.[5]  Prior to trial, the parents and Grandparents participated in home-study evaluations.  Parents and Grandparents also underwent individual psychological evaluations.

[¶9.]	A three-day custody trial was held in August 2011.  Grandparents and Father testified.  Mother did not testify or call witnesses.  The home-study evaluator, Ms. Zimbelman, indicated that at the time of trial, Mother wished to have the children be raised by Grandparents.  Mother, however, also informed Ms. Zimbelman that Mother's ultimate goal was to have the children live with her.

[¶10.]	Father actively sought full custody.  Some concerns were expressed regarding Father's ability to parent the children.  The concerns involved Father's history of alcohol-related offenses, employment at a bar where he often worked

---

5.	Procedurally, Grandparents filed a separate summons and complaint starting a new action to obtain custody of the children.  Prior to trial in the parents' custody action, Grandparents moved to "join" the two actions.  The parties and the court treated Grandparents' pleadings as a motion to intervene in the parents' custody dispute.  The circuit court granted "joinder," consolidating the two actions and allowing Grandparents to intervene in Mother and Father's custody proceeding.  However, all further pleadings—including the notice of appeal—were filed in Grandparents' action seeking custody.  Therefore, the parties in this appeal are aligned as set forth in the caption of this opinion: Grandparents are the plaintiffs, and Mother and Father are the defendants.

nights, lack of a driver's license,[6] and obsessive compulsive personality characteristics. There was, however, no contention that father was unfit.

[¶11.] Ms. Zimbelman reported that between Mother and Father, "[Father's] care would allow the children to remain in the same community and spend time with both their maternal and paternal grandparents on a regular basis." On the other hand, Ms. Zimbelman indicated that "[p]lacing the children with [Mother] would lessen the support system for the children because of [the lack of] family availability." As between Mother, Father, and Grandparents, Ms. Zimbelman opined that it would be in the "best interests" of the children for Grandparents to be awarded physical custody of the children. Ms. Zimbelman indicated that the children were "more closely attached to their grandparents."

[¶12.] The circuit court awarded legal and physical custody to Grandparents. Father was awarded visitation in accordance with the South Dakota Visitation Guidelines. Additionally, Father's motion for attorney's fees was denied.

[¶13.] We address the following issues on appeal:

1. Whether the circuit court erred in allowing Grandparents to join/intervene in the parents' custody dispute.

2. Whether the circuit court erred in determining that Father's presumptive right to custody was rebutted under SDCL 25-5-29 and SDCL 25-5-30.

3. Whether the circuit court erred in determining that each party was responsible for their own attorney's fees.

---

6. Ms. Zimbelman testified that Father lost his driver's license because he failed to pay child support and because he had received a speeding ticket. She testified that Father would have to pay Mother $2,000 in child support to reacquire his driver's license.

4.       Whether either party is entitled to appellate attorney's fees.

*Decision*

[¶14.]       This case involves the interpretation of statutes overriding a parent's presumptive right to custody of his children. *See* SDCL 25-5-29 to -30. "Statutory interpretation is a question of law, reviewed de novo." *In re Guardianship of S.M.N., T.D.N., and T.L.N.*, 2010 S.D. 31, ¶ 9, 781 N.W.2d 213, 217. The specific statutory language at issue involves extraordinary circumstances and serious detriment to the welfare of children. "Whether the facts of [a] case constitute extraordinary circumstances of serious detriment to the welfare of . . . children . . . is a conclusion of law that we review de novo." *Id.* ¶ 11 (citing *Meldrum v. Novotny*, 2002 S.D. 15, ¶ 49, 640 N.W.2d 460, 469). This case finally involves a parent's claim that an award of custody to nonparents violates the parent's constitutional rights. "An appeal asserting an infringement of a constitutional right is . . . reviewed under the de novo standard of review[.]" *Id.* ¶ 10.

*Joinder/Intervention by Grandparents*

[¶15.]       The parties disagree whether Grandparents were entitled to join/intervene in the parents' custody dispute. "SDCL 25-5-29 expressly authorizes nonparents to petition for custody or visitation if they have served as the child[ren]'s primary caretaker, are closely bonded as a parental figure, or have otherwise formed a significant and substantial relationship." *Clough v. Nez*, 2008

S.D. 125, ¶ 11, 759 N.W.2d 297, 302. The statute permits intervention on the same showing. SDCL 25-5-29.[7]

[¶16.] Father concedes "that [Grandparents] were the primary caregivers for [two] years."[8] But, Father argues that intervention was improper because "the constitutional presumption [to the care, custody and control of children] due parents [was not] rebutted" at the time the motion for joinder/intervention was granted.

[¶17.] We first observe that a nonparent's service as a child's primary caretaker may be sufficient to rebut a parent's constitutional presumptive rights to the care and custody of his children. *Clough*, 2008 S.D. 125, ¶ 16, 759 N.W.2d at 304 (citing SDCL 25-5-29(4) and SDCL 25-5-30(3)). We also observe that parties need not prove their ultimate case in order to intervene. A pleading for intervention "is construed liberally in favor of the pleader-intervenor and the court will accept as true the well-pleaded allegations in the pleading." 7C Charles Alan Wright, Arthur R. Miller, Mary Kay Kane & Richard L. Marcus, Federal Practice and Procedure §

---

7. SDCL 25-5-29 provides in pertinent part:

> [T]he court may allow any person other than the parent of a child to intervene or petition a court of competent jurisdiction for custody or visitation of any child with whom he or she has served as a primary caretaker, has closely bonded as a parental figure, or has otherwise formed a significant and substantial relationship. . . .

8. A hearing on Father's motion to reconsider the issue of joinder/intervention was held on March 16, 2011. Father's attorney conceded that Grandparents had been the children's primary caretakers.

1914 (3d ed. 2012).[9]  Therefore, at the time Grandparents moved to join/intervene, they were not required to meet their trial burden of rebutting the constitutional presumptions due a parent.  Grandparents were only required to assert well-pleaded facts supporting their claim.  After all, without appearing as parties, Grandparents would not have had standing to call witnesses and introduce evidence in an attempt to rebut Father's presumptive right to the care, custody, and control of his children.

[¶18.]      In this case, at the time of joinder/intervention, there was no dispute that Grandparents had served as the children's primary caretakers for approximately two years.  Therefore, Grandparents made a sufficient showing for joinder/intervention under SDCL 25-5-29 and *Clough,* 2008 S.D. 125, ¶ 16, 759 N.W.2d at 304.  The circuit court did not err in allowing Grandparents to join/intervene.

*Father's Presumptive Right to Custody*

[¶19.]      "Natural parents have a fundamental right to the care, custody, and control of their children." *S.M.N.*, 2010 S.D. 31, ¶ 17, 781 N.W.2d at 221 (citing *Troxel v. Granville,* 530 U.S. 57, 66, 120 S. Ct. 2054, 2060, 147 L. Ed. 2d 49 (2000); *Santosky v. Kramer*, 455 U.S. 745, 758-59, 102 S. Ct. 1388, 1397, 71 L. Ed. 2d 599

---

9.    South Dakota's intervention rules are similar to Federal Rule of Civil Procedure 24.  *See In re Adoption of D.M.*, 2006 S.D. 15, ¶ 5, 710 N.W.2d 441, 443-44; SDCL 15-6-24.  In analyzing FRCP 24, federal courts have noted that "a district court is required to accept as true the non-conclusory allegations made in support of an intervention motion." *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 819 (9th Cir. 2001) (citing cases from the Fourth, Fifth, Seventh, and Eight Circuits).

#26195

(1982)).  "The fundamental liberty interest of natural parents . . . does not evaporate simply because they have not been model parents[.]"  *Id.* (quoting *Santosky*, 455 U.S. at 753, 102 S. Ct. at 1394-95).  The state has no reason to interject itself into the child-rearing decisions of a fit parent "so long as a parent adequately cares for his or her children (*i.e.*, is fit)[.]"  *Id.* (quoting *Troxel*, 530 U.S. at 68-69, 120 S. Ct. at 2061).  *Troxel* does not, however, require "a finding of parental unfitness in third party visitation or custody cases" if other extraordinary circumstances exist.  *Feist v. Lemieux-Feist*, 2010 S.D. 104, ¶ 7, 793 N.W.2d 57, 61.

[¶20.]        Under South Dakota law, "[a] parent's presumptive right to custody of his or her child may be rebutted by proof" of one or more of the following extraordinary circumstances:

> (1) That the parent has abandoned or persistently neglected the child;
> (2) That the parent has forfeited or surrendered his or her parental rights over the child to any person other than the parent;
> (3) That the parent had abdicated his or her parental rights and responsibilities; or
> (4) That other extraordinary circumstances exist which, if custody is awarded to the parent, would result in serious detriment to the child.

SDCL 25-5-29.  A parent's presumptive right to custody must be rebutted by clear and convincing evidence.  *See S.M.N.*, 2010 S.D. 31, ¶¶ 21-22, ¶ 25, 781 N.W.2d at 222-24 (stating that extraordinary circumstances, abandonment, and abdication of parent rights and responsibilities must be proven by clear and convincing evidence).

[¶21.]        The circuit court first found that Grandparents had rebutted Father's presumptive right to custody under SDCL 25-5-29(2) and (3).  Those subsections require the forfeiture, surrender, or abdication of parental rights or responsibilities

-9-

to an individual other than a parent. "Abdication of parental rights and responsibilities is akin to abandonment[.]" *Id.* ¶ 25. To constitute abandonment in a termination of parental rights case:

> [I]t must appear by clear and convincing evidence that there has been by the parent[ ] a giving-up or total desertion of the minor child[ren]. In addition, there must be a showing of an intent on the part of the parent to abandon and to relinquish parental obligations; this intent may be inferred from conduct. When examining intent, the court should consider a parent's presence, love, care, affection, and monetary support.

*Id.* (quoting *In re Adoption of C.D.B.*, 2005 S.D. 115, ¶ 12, 706 N.W.2d 809, 814). We believe the same showing should be required when a nonparent seeks custody and control of a parent's child under SDCL 25-5-29(2) and (3).

[¶22.]    In this case, Grandparents point out that Father did not provide custodial care for his children during a portion of 2008, all of 2009, and a majority of 2010. Instead, Father relied on Grandparents to provide that care.[10] Yet, Father did not totally desert or abandon the children or relinquish all parental obligations. Father paid child support until the middle of 2010. He testified that he stopped paying support because the payments were going to Mother, who was no longer caring for the children. Father also maintained visitation and contact with his children, and he refused to allow a guardianship, demonstrating his intent not to abdicate his parental rights and responsibilities.

---

10.    There is evidence in the record that Mother was not capable of caring for the children. We do not discuss Mother's faults and omissions because she did not seek custody and has not appealed the award of custody to Grandparents.

[¶23.]     Moreover, when Father obtained temporary custody on an alternating weekly basis in September 2010, he became meaningfully involved in the care of the children. Ten months later, at the time of trial, the home-study evaluator acknowledged that Father had been adequately caring for the children. Considering the totality of the circumstances, there was no showing of a total desertion of the children or "an intent on the part of . . . [Father] to abandon and to relinquish parental obligations[.]" *See id.* Because Grandparents failed to provide clear and convincing evidence that Father forfeited, surrendered, or abdicated his parental rights and responsibilities, the court erred in determining that Father's presumptive right to custody was rebutted under SDCL 25-5-29(2) and (3).

[¶24.]     The circuit court also found that Father's presumptive right to custody was rebutted under SDCL 25-5-29(4), and SDCL 25-5-30(2) and (3). By the enactment of SDCL 25-5-29 and 30, "the Legislature . . . provided a mechanism for extraordinary circumstances to justify awarding custody or visitation to a third party over a fit parent's objections." *Feist*, 2010 S.D. 104, ¶ 12, 793 N.W.2d at 62. To rebut the parental presumption under SDCL 25-5-29(4), a nonparent must present "evidence of extraordinary circumstances that would result in serious detriment to the children." *Beach v. Coisman*, 2012 S.D. 31, ¶ 9, 814 N.W.2d 135, 139. SDCL 25-5-30 delineates some of the circumstances that may result in serious detriment to children. SDCL 25-5-30 provides:

> Serious detriment to a child may exist whenever there is proof of one or more of the following extraordinary circumstances:
> (1) The likelihood of serious physical or emotional harm to the child if placed in the parent's custody;
> (2) The extended, unjustifiable absence of parental custody;

(3) The provision of the child's physical, emotional, and other needs by persons other than the parent over a significant period of time;

(4) The existence of a bonded relationship between the child and the person other than the parent sufficient to cause significant emotional harm to the child in the event of a change in custody;

(5) The substantial enhancement of the child's well-being while under the care of a person other than the parent;

(6) The extent of the parent's delay in seeking to reacquire custody of the child;

(7) The demonstrated quality of the parent's commitment to raising the child;

(8) The likely degree of stability and security in the child's future with the parent;

(9) The extent to which the child's right to an education would be impaired while in the custody of the parent; or

(10) Any other extraordinary circumstance that would substantially and adversely impact the welfare of the child.

Extraordinary circumstances causing serious detriment must be established by clear and convincing evidence. *See S.M.N.*, 2010 S.D. 31, ¶ 26, 781 N.W.2d at 224.

[¶25.] In support of its finding of serious detriment, the circuit court relied on SDCL 25-5-30(2), which requires "[t]he extended, unjustifiable absence of parental custody[.]" The circuit court also relied on SDCL 25-5-30(3), which examines "[t]he provision of the child's physical, emotional, and other needs by persons other than the parent over a significant period of time[.]" We recognize that Grandparents served as the children's primary caretakers for approximately two years. We also acknowledge "that parental unfitness is [often] implicit in many of the circumstances . . . identified in SDCL 25-5-29 and 25-5-30." *Feist*, 2010 S.D. 104, ¶ 12, 793 N.W.2d at 62. Grandparents have not, however, alleged, and the circuit court did not find, that Father was unfit. Further, "to adequately protect the natural parent's fundamental liberty interest in the custody of h[is] children, extraordinary circumstances must denote more than a simple showing of the

children's best interests." *Id.* ¶ 10. Therefore, we must consider whether in addition to Grandparents' provision of custodial care, they proved by clear and convincing evidence that an award of custody to Father would cause serious detriment to the children.

[¶26.] At trial, Ms. Zimbelman elaborated on her report recommending Grandparent custody. Ms. Zimbelman expressed some concern about Father's ability to parent the children because he had never been a single, full-time parent. But, at that point, Father had custody of the children on an alternating weekly basis for almost a year. And, Ms. Zimbelman acknowledged that "[Father] hasn't done a poor job [parenting]. I just don't see where it's been easy for him. Doesn't mean he can't do it. I think he needs more help, and he needs somebody to help him with organization." Ms. Zimbelman also acknowledged that during the ten months prior to trial, Father had renewed his commitment to his children. Ms. Zimbelman was asked: "And he's actually stepping up to care for these children, isn't he?" She replied: "He is now, yes." She further acknowledged that when Father "has [the children] in his care, he's able to care for them." When asked if Father was a good parent, Ms. Zimbelman testified: "To this point when the children are with him, and what I've seen when they are with him, he responds to their needs. He can deal with the problems they have. He provides for them when they are in his care." Ms. Zimbelman finally agreed that Father was involved in the children's activities.

[¶27.] Similarly, Father's mother testified: "I have seen a tremendous change in the past year. I see him much more comfortable in his own skin with the [children]. I see him more and more as the father figure that he needs to be." When

P.D.M.'s teacher was asked to describe the relationship between Father and son, she described the relationship as "loving" and "gentle." She also indicated that Father had participated in several of P.D.M.'s preschool field trips.

[¶28.] Nevertheless, Grandparents rely on Ms. Zimbelman's report indicating that "[t]o take [the children] from [Grandparents] on a permanent basis would cause the children emotional distress." Yet, when the court asked Ms. Zimbelman to elaborate at trial, she explained that a change of custody would be "a change of living environment" and "a change of experience . . . that would be . . . different to [the children][,]" but it can and could be done.[11] She also testified that the children had been in Father's home for ten months "so [they are] adjusted to [Father's]

---

11. The court: [Y]ou feel that extraordinary circumstances exist in this case, that if custody is awarded to a parent, it would result in serious detriment to the children?
. . .
I'm—just assuming that the kids would be with the—in the custody of their father and the grandparents would be entitled to visitation, . . . [d]o you still have that concern that that would cause the children emotional distress . . . ?

Zimbelman: Because of their history, the—the history that they've had living with and spending so much time with their grandparents, *to make that change now would be basically changing physical custody* is—how it would—how it makes sense in my mind when I'm looking at how the children would view that.
. . .
And then your question is: would that cause them emotional distress? It's a—*it's a change of custody, a change of living environment, a change of experience there that would be so different to them. It can be done*, but I would say they—if that does happen, they should have opportunity to have some counseling and they need to see their grandparents on a regular basis a couple times a week.

(Emphasis added.)

home" as well as Grandparents' home. In discussing continuity, she indicated that the children could remain in either home. In her opinion, there was no need to remove the children from Father's or Grandparents' home. Therefore, this is a case in which the evidence indicates that the distress of spending less time with Grandparents would understandably impact the children. But, changes merely "impact[ing]" children are insufficient to constitute extraordinary circumstances resulting in serious detriment. *Beach*, 2012 S.D. 31, ¶ 9, 814 N.W.2d at 139. The distress children normally endure in changing custody is not in and of itself an extraordinary circumstance causing serious detriment within the meaning of SDCL 25-5-29(4) and SDCL 25-5-30. *See* SDCL 25-5-29(4) (requiring that "serious detriment to the child" must occur if custody is awarded to the parent). Here, Ms. Zimbelman did not indicate that Father's resumption of full physical custody would cause serious detriment. Ms. Zimbelman stated that a change "c[ould] be done" so long as the children had continued contact with Grandparents and possible counseling.[12]

[¶29.] The court also overlooked the basis for Ms. Zimbelman's recommendation that favored Grandparent custody. Ms. Zimbelman's recommendation was explicitly made without consideration of the presumptions due a parent. She testified that her recommendation was based solely on the best

---

12. The court apparently assumed that granting custody to Father meant that the children would no longer have contact with their Grandparents. But Father testified: "I will never stop [the children] from seeing [their Grandparents]."

interests standard used in parental custody disputes.[13] Thus, Ms. Zimbelman indicated her opinion was based on an "equal assessment and comparison of [the] three parties." She indicated that she focused only on "what's going to be best for these children." Although that focus is appropriate in child custody disputes between parents, it falls short of the extraordinary circumstances and serious detriment necessary to award custody to a nonparent over a parent's objection.

[¶30.]     We find it instructive to contrast this case with the nonparent custody awarded in *Meldrum v. Novotny*. 2002 S.D. 15, 640 N.W.2d 460. Both cases involved custody disputes between nonparents and a biological parent. In *Meldrum*, however, "[t]here were many years where there was no contact between father and son." *Id.* ¶ 59 (Konenkamp, J., concurring in part). Here, although Grandparents provided the children's custodial care for a lengthy period of time, Father remained in contact with his children. Additionally, the record in *Meldrum* "contain[ed] uncontradicted expert testimony that a permanent return of custody to the father would cause serious emotional detriment [to the child]." *Id.* In this case, although the expert's report indicated that the children would suffer distress in changing custody, the expert's report and accompanying testimony did not indicate that the distress would result in serious emotional detriment to the children.

[¶31.]     In summary, the law does not permit an award of custody to "nonparents simply because they may be better custodians." *Id.* ¶ 57 (Konenkamp, J., concurring in part). The question is whether Father's presumptive right to

---

13.    Ms. Zimbelman's report and testimony reflected that she based her opinion solely on the *Fuerstenberg* factors. *See Fuerstenberg v. Fuerstenberg*, 1999 S.D. 35, 591 N.W.2d 798.

custody was rebutted by clear and convincing evidence of extraordinary circumstances that would result in serious detriment to the children. Here, Father had been caring for his children for almost a year on an alternating weekly basis under the temporary order, and there was no clear and convincing evidence that awarding full custody to Father would cause the children serious detriment. Accordingly, the circuit court erred in awarding Grandparents legal and physical custody under SDCL 25-5-29 and SDCL 25-5-30. Because Grandparents did not meet their high evidentiary burden in this kind of case, we may not consider the court's findings regarding the best interests of the children. It is only when a "non-parent prevails, either on the claim of parental unfitness or extraordinary circumstances" that the best interests of the child test become applicable. *Id.* ¶ 50 (Gilbertson, C.J., writing on issue three).

*Attorney's Fees at Trial*

[¶32.] The circuit court ordered that each party was responsible for their own attorney's fees. "The court, if appropriate, in the interests of justice, may award payment of attorneys' fees in all cases of . . . custody[.]" SDCL 15-17-38. "The circuit court must 'enter findings of fact and conclusions of law when ruling on a request for attorney's fees.'" *Beach*, 2012 S.D. 31, ¶ 13, 814 N.W.2d at 140.

[¶33.] Here, the circuit court did not enter findings of fact and conclusions of law on this issue. "Without findings of fact and conclusions of law, this Court cannot conduct an adequate review of the circuit court's decision." *Id.* Additionally, Father has now become the prevailing party. Therefore, we remand the issue of attorney's fees for findings of fact, conclusions of law, and reconsideration.

*Appellate Attorney's Fees*

[¶34.]     Both Father and Grandparents moved for appellate attorney's fees. "SDCL 15-26A-87.3 permits an award of appellate attorney's fees if they are otherwise allowable and if they are accompanied by a verified, itemized statement of the legal services rendered." *Toft v. Toft*, 2006 S.D. 91, ¶ 26, 723 N.W.2d 546, 554. As mentioned above, SDCL 15-17-38 authorizes attorney's fees in custody cases. Considering the relative financial condition of the parties, the genesis for this litigation, the good faith arguments presented by all parties, and the closeness of the case, we decline to award appellate attorney's fees.

[¶35.]     Reversed and remanded for further proceedings consistent with this opinion.

[¶36.]     GILBERTSON, Chief Justice, and KONENKAMP, SEVERSON, and WILBUR, Justices, concur.