#30630, #30642-aff in pt & rev in pt-SPM
**2025 S.D. 51**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

MILES MELIUS and
TORI MELIUS,                                          Plaintiffs and Appellees,

    v.

LAKOTA SONGER,                                   Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
GREGORY COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE BOBBI J. RANK
Judge

* * * *

ROSEANN WENDELL
Pierre, South Dakota                              Attorney for defendant and
                                                              appellant.


DAVA A. WERMERS
Mitchell, South Dakota                           Attorney for plaintiffs and
                                                              appellees.


* * * *

CONSIDERED ON BRIEFS
JANUARY 13, 2025
OPINION FILED **08/27/25**

#30630, #30642

MYREN, Justice

[¶1.]     Miles and Tori Melius initiated a third-party custody action against Lakota Songer and Cheryl Melius, the biological parents of B.M.  Cheryl did not participate in the proceedings.  The circuit court placed B.M. in the temporary custody of the Meliuses and awarded Lakota visitation on a stepped-up basis during the pendency of the proceedings.  After the custody trial, the circuit court awarded custody of B.M. to Lakota but awarded visitation to the Meliuses.  The circuit court also ordered Lakota to use a specific daycare provider and assessed attorney fees against him.  Lakota appealed and raised three issues.  By notice of review, the Meliuses raised two issues.  We affirm in part and reverse in part.

## Factual and Procedural Background

[¶2.]     Cheryl Melius became pregnant while she and Lakota Songer were engaged in a consensual relationship.  Their relationship had ended by the time Cheryl gave birth to B.M. on October 31, 2021.  Cheryl did not put Lakota's name on B.M.'s birth certificate or immediately inform him of the birth.  A short time later, Cheryl informed Lakota of B.M.'s birth and initially allowed him contact before withholding it.

[¶3.]     B.M. was in Cheryl's sole care and custody for the first three and one-half months of her life.  On February 17, 2022, a physician diagnosed B.M. with failure to thrive,[1] and the Department of Social Services initiated an abuse and

---

1.   "Children are diagnosed with failure to thrive when their weight or rate of weight gain is significantly below that of other children of similar age and sex."  Failure to Thrive, https://www.hopkinsmedicine.org/health/conditions-and-diseases/failure-to-thrive (last visited Aug. 21, 2025).

-1-

neglect assessment. Cheryl voluntarily placed B.M. in the care of her brother, Miles, and his wife, Tori (collectively the Meliuses). The Department of Social Services was no longer involved in this case after this placement. Cheryl eventually granted the Meliuses guardianship over B.M. in March 2022. The Meliuses initially allowed Lakota some contact with B.M. but then began withholding all contact.

[¶4.] About a month before B.M. was diagnosed with failure to thrive, Lakota initiated a paternity action against Cheryl. Genetic testing established that Lakota was B.M.'s father, so he filed a motion for immediate temporary custody. Before the circuit court ruled on that motion, the Meliuses initiated a third-party custody action against Lakota and Cheryl and filed a motion to intervene in the pending action between Lakota and Cheryl.

[¶5.] In June 2022, the circuit court held a combined hearing on the pending motions in both files because it anticipated significant overlap.[2] Because B.M. had been in the care of the Meliuses for roughly six months at the time of the hearing and they were "closely bonded" to B.M., the circuit court concluded the Meliuses were "interested parties" and allowed them to intervene in the action between Lakota and Cheryl. Based on B.M.'s failure to thrive in Cheryl's care, the circuit court concluded, "I don't think there's any doubt that there's a likelihood of serious physical harm to the child if placed in [Cheryl's care][.]" The circuit court expressed its concern that the Meliuses were withholding contact between Lakota and B.M.

---

2. Lakota's action against Cheryl (26CIV22-5) and the Meliuses' action against Lakota and Cheryl (26CIV22-27) were never formally consolidated. But as the circuit court noted in its final findings of fact and conclusions of law, "the cases have been consolidated as a practical matter."

for the purposes of preventing a bond so they could obtain permanent custody. However, it also noted that B.M. had become healthy while in the Meliuses' care. The circuit court also expressed concerns about Lakota's living arrangement because there were seven people and several dogs living in his home.

[¶6.] For purposes of temporary custody, the circuit court concluded that Lakota's living situation at the time constituted "extraordinary circumstances" and awarded the Meliuses temporary custody. However, the circuit court crafted a visitation schedule for Lakota that increased his contact with B.M. each week. To ensure B.M.'s stability during the proceedings, the circuit court ordered that Lakota continue daycare with Tori's mother, Teri Tracy. The circuit court also ordered a custody evaluation.

[¶7.] In February 2023, the Meliuses filed a motion for ex parte emergency custody. Tori submitted an affidavit that alleged various concerns, including diaper rashes and other hygiene-related issues. She alleged that, on one occasion, she had to take B.M. to the emergency room because of a particularly severe diaper rash. She also claimed that Lakota's mother, Donna, was providing care for B.M. when Lakota was exercising visitation. Finally, Tori alleged that Lakota recently threatened suicide. Chelsea Medrano, Lakota's ex-girlfriend, submitted an affidavit describing Lakota's alleged suicide threat and the quality of care he provided for B.M.

[¶8.] On February 22, 2023, the circuit court entered an ex parte emergency custody order halting Lakota's visitation, but it held a contested hearing on the motion on March 1, 2023. Lakota did not present any testimony or witnesses, but

five witnesses testified for the Meliuses, including Medrano. Much of the testimony was related to the diaper rash issue alleged in Tori's affidavit. Medrano testified that during an argument while driving, Lakota threatened to grab the steering wheel and run the vehicle off the road. Medrano testified that Lakota refused to change B.M.'s diapers and that she or Donna completed B.M.'s diaper changes.

[¶9.] At the conclusion of the hearing, the circuit court denied the Meliuses' motion for emergency custody. It determined that although the diaper rashes were uncomfortable for B.M., they did not rise to the level of an emergency. The circuit court found Medrano was not credible and said it gave little weight to her affidavit and testimony. This assessment was based, in part, on a Facebook post made by Medrano two days before she and Lakota broke up in which she described Lakota as "the best daddy out there[.]" The custody and visitation arrangement the circuit court originally ordered went back into effect.

[¶10.] Erin Nielsen Ogdahl conducted a custody evaluation. She visited both homes and reviewed the affidavits and other documents that had been filed in connection with the proceedings. Ogdahl viewed the Meliuses positively and explained there were no mental or physical conditions that would impair their ability to parent, that they had provided for B.M.'s needs, and that they had the financial ability to care for B.M. Conversely, she generally viewed Lakota negatively, explaining that B.M.'s diaper rashes intensified under his care and that he did not properly clean B.M. Ogdahl concluded that "Lakota lacks the ability, stability, and capacity to parent at this time." Ogdahl recommended that custody

should remain with the Meliuses and that Lakota should have visitation according to a specific schedule.

[¶11.]     The Meliuses filed a motion for contempt alleging that Lakota contemptuously stopped using the court-ordered daycare provider and allowed Medrano to reside in his home in violation of the court's order while he was caring for B.M.  Ultimately, the circuit court took evidence related to this motion during the custody hearing.

[¶12.]     Three days before the scheduled trial date, Lakota's counsel disclosed that Lakota was an enrolled member of the Rosebud Sioux Tribe.  Based on the gravity of that disclosure, the circuit court delayed the trial by roughly a month.  After the Tribe verified that B.M. was eligible for enrollment, the circuit court determined that the Indian Child Welfare Act (ICWA) applied to the proceedings.  The Tribe was given notice of the proceedings, and the parties obtained ICWA-qualified experts to testify at the trial.[3]

[¶13.]     At trial, the Meliuses testified and called three other witnesses: Teri Tracy, Erin Nielsen Ogdahl, and Luke Yellow Robe.  Medrano did not testify at the trial.  The Meliuses both explained that they had become attached to B.M., and they desired to maintain custody.  They also testified about B.M.'s cleanliness when B.M. was returned after visitations with Lakota.  Specifically, Tori testified that when Lakota first started having overnight visits with B.M., she would almost always be returned dirty and with a diaper rash.  However, she also testified that "in the last couple of months it has gotten better."

---

3.     The Tribe ultimately did not participate in the proceedings.

[¶14.]     Ogdahl testified about how she completed the custody evaluation and reiterated her recommendation.  Through cross-examination, Lakota highlighted Ogdahl's apparent bias against him and that her recommendation was based, in part, on Medrano's affidavit, which the circuit court had previously determined was not credible.

[¶15.]     Luke Yellow Robe, the Meliuses' ICWA-qualified expert witness, opined that the Meliuses had made "active efforts" to prevent the breakup of the Indian family.  Yellow Robe expressed a sense of hesitancy regarding Lakota receiving custody of B.M.  During his testimony, he canvassed the issues that had arisen when B.M. was in Lakota's care and expressed concern that these issues may continue.

[¶16.]     Lakota testified and called three other witnesses: Renee Bear Stops, Nikki Kavanagh, and Donna.  Bear Stops, Lakota's ICWA-qualified expert witness, admitted that the documentation of the diaper rashes and other hygiene-related issues was concerning but also explained that Lakota's parenting skills had improved and would continue to improve with the help of his family and community.  Her "overall opinion of this case [was that] Lakota should be able to parent his child in a permanent capacity[.]"

[¶17.]     Nikki Kavanagh is an employee of Sesdac, Inc., a non-profit that provides services and support for people with disabilities.  Kavanagh testified about the support she had provided to the Songer family in the past and the support she could offer to Lakota in the future.

[¶18.]     Donna testified that Lakota and B.M. had become attached and that he had grown as a parent during the proceedings. She explained that Lakota was uncomfortable changing diapers when he first started having visitation with B.M. but that he overcame his initial reluctance. She also explained that part of the reason B.M. had developed diaper rashes was because Lakota and the Meliuses were using different brands of diapers. Donna explained that once the parties started using the same brand of diapers, the rashes began to improve.

[¶19.]     Lakota testified that, as a new parent, he was confused when he first started having visitation with B.M. However, Lakota also believed he was growing as a parent. He explained that he was enrolled in parenting classes and planned to continue seeking the guidance of his family.

[¶20.]     Following the trial, the circuit court issued a bench decision and later incorporated its ruling into findings of fact and conclusions of law. The circuit court concluded that the Meliuses "satisf[ied] the preliminary requirements under SDCL 25-5-29 because they have established by clear and convincing evidence of [ ] being closely bonded with [B.M.] as parental figures and have formed a significant and substantial relationship with the child." However, the circuit court further concluded that the Meliuses "failed to prove, by clear and convincing evidence, any extraordinary circumstances under SDCL 25-5-30." The circuit court also concluded that the Meliuses "failed to present clear and convincing evidence that continued custody by Lakota would result in serious emotional and physical damage to [B.M.]" Despite these conclusions, the circuit court further reasoned "[i]t would be adverse to [B.M.]'s best interests for all contact with [the Meliuses] to cease, and there

should be ongoing contact with them through a transition plan." The circuit court ultimately awarded Lakota sole physical and legal custody of B.M., with visitation to the Meliuses. Despite describing it as a transition plan, the circuit court's order does not include any future elimination of the visitation for the Meliuses. The circuit court also ordered Lakota to continue daycare with Teri Tracy.

[¶21.] The circuit court ordered Lakota to pay attorney fees related to the delay in the proceedings caused by his late disclosure of his tribal status. It also ordered him to pay attorney fees for contemptuously violating the court's orders. The circuit court explained: "Lakota was aware of the [c]ourt's previous orders regarding not having overnight visitors in his home and keeping [B.M.] in daycare and knowingly and contumaciously violated those orders and hence was in contempt of those previous orders." It concluded that "Lakota should be responsible for reasonable attorney fees for the contempt action as well as attorney's fees directly tied to the delay in advising the [c]ourt and counsel of his tribal enrollment, thereby causing the trial to be postponed."

[¶22.] By notice of appeal, Lakota raises three issues: (1) whether the circuit court erred when it awarded the Meliuses visitation; (2) whether the circuit court erred when it ordered Lakota to use a specific daycare provider; and (3) whether the circuit court abused its discretion when it ordered him to pay attorney fees for the late disclosure of his tribal enrollment.

[¶23.] By notice of review, the Meliuses raise two issues: (1) whether the circuit court erred when it determined there were no extraordinary circumstances under SDCL 25-5-30 to support an order for non-parent custody; and (2) whether

the circuit court clearly erred when it determined that B.M. would not suffer serious emotional or physical damage in Lakota's care. We have combined and reformulated the issues for clarity and convenience.

### Decision

> **1. Whether the circuit court erred when it determined there were no extraordinary circumstances entitling the Meliuses to the custody of B.M. under SDCL 25-5-30 and whether the circuit court erred when it awarded the Meliuses visitation.**

[¶24.] There is significant overlap between the first issue raised by Lakota and the first issue raised by the Meliuses. Both issues turn on the application of the same statutes and decisional law to the facts as found by the circuit court. Accordingly, we analyze these claims together. As we will explain, logically and legally, because the Meliuses fail on their first issue, Lakota must prevail on his first issue.

[¶25.] "Determining whether extraordinary circumstances exist sufficient to overcome parental rights regarding the custody of children is a question of law reviewed de novo." *Aguilar v. Aguilar*, 2016 S.D. 20, ¶ 9, 877 N.W.2d 333, 336 (citing *In re Guardianship of S.M.N.*, 2010 S.D. 31, ¶ 11, 781 N.W.2d 213, 218). Similarly, "[c]ases involving an award of custody [or visitation] to non[-]parents allegedly in violation of the parent's constitutional rights are reviewed de novo." *Howlett v. Stellingwerf*, 2018 S.D. 19, ¶ 12, 908 N.W.2d 775, 780 (citation omitted). "The court's factual findings will not be disturbed unless they are clearly erroneous." *Aguilar*, 2016 S.D. 20, ¶ 9, 877 N.W.2d at 336 (citation omitted). "Therefore, we 'will overturn findings of fact on appeal only when a complete review

of the evidence leaves the Court with a definite and firm conviction that a mistake has been made.'" *Id.* (quoting *Clough v. Nez*, 2008 S.D. 125, ¶ 8, 759 N.W.2d 297, 301). "We 'give due regard to the opportunity of the circuit court to judge the credibility of witnesses and to weigh their testimony properly.'" *Id.* (citation omitted).

[¶26.]        "[T]he Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000). In *Fuerstenberg v. Fuerstenberg*, this Court stated that "[b]etween *parents* adversely claiming custody, neither may be preferred over the other." 1999 S.D. 35, ¶ 22, 591 N.W.2d 798, 806–07 (emphasis added) (citation omitted). In other words, in a custody dispute involving parents, the law views each parent equally. *See Wasilk v. Wasilk*, 2024 S.D. 79, ¶ 33, 15 N.W.3d 497, 505 (holding *Troxel's* presumption in favor of a fit parent does not apply in dispute between parents).

[¶27.]        Conversely, *Troxel's* recognition of parental primacy does apply in "[d]isputes between parents and [non-parents]" which we have explained "are not contests between equals." *Howlett*, 2018 S.D. 19, ¶ 14, 908 N.W.2d at 780 (first alteration in original) (citation omitted). "This is because[,] unlike non[-]parents, '[n]atural parents have a fundamental right to the care, custody, and control of their children.'" *Id.* (third alteration in original) (citation omitted). To protect this fundamental right, our statutes establish a presumption that it is in the best interests of a child for custody to remain with the parent. *See* SDCL 25-5-29.

[¶28.]       SDCL 25-5-29 allows a non-parent to petition a court for custody or

visitation while also protecting a parent's presumptive right to custody.  It reads:

> [T]he court may allow any person other than the parent of a
> child to intervene or petition a court of competent jurisdiction for
> *custody or visitation* of any child with whom he or she has
> served as a primary caretaker, has closely bonded as a parental
> figure, or has otherwise formed a significant and substantial
> relationship.  It is presumed to be in the best interest of a child
> to be in the care, custody, and control of the child's parent, and
> the parent shall be afforded the constitutional protections as
> determined by the United States Supreme Court and the South
> Dakota Supreme Court.  A parent's presumptive right to custody
> of his or her child may be rebutted by proof:
> (1)   That the parent has abandoned or persistently neglected
>        the child;
> (2)   That the parent has forfeited or surrendered his or her
>        personal rights over the child to any person other than
>        the parent;
> (3)   That the parent has abdicated his or her parental rights
>        and responsibilities; or
> *(4)   That other extraordinary circumstances exist which, if
>        custody is awarded to the parent, would result in serious
>        detriment to the child.*

*Id.* (emphasis added).

[¶29.]       SDCL 25-5-30 elaborates on the catchall in SDCL 25-5-29(4) and

enumerates circumstances that suggest extraordinary circumstances that would

result in serious detriment to the child:

> (1)   The likelihood of serious physical or emotional harm to
>        the child if placed in the parent's custody;
> (2)   The extended, unjustifiable absence of parental custody;
> (3)   The provision of the child's physical, emotional, and other
>        needs by persons other than the parent over a significant
>        period of time;
> (4)   The existence of a bonded relationship between the child
>        and the person other than the parent sufficient to cause
>        significant emotional harm to the child in the event of a
>        change of custody;
> (5)   The substantial enhancement of the child's well-being
>        while under the care of a person other than the parent;

>   (6)     The extent of the parent's delay in seeking to reacquire custody of the child;
>   (7)     The demonstrated quality of the parent's commitment to raising the child;
>   (8)     The likely degree of stability and security in the child's future with the parent;
>   (9)     The extent to which the child's right to an education would be impaired while in the custody of the parent; or
>   (10)    Any other extraordinary circumstances that would substantially and adversely impact the welfare of the child.

"The presence of [extraordinary] circumstances may be proven only by clear and convincing evidence." *Aguilar*, 2016 S.D. 20, ¶ 10, 877 N.W.2d at 336 (citing *Veldheer v. Peterson*, 2012 S.D. 86, ¶ 20, 824 N.W.2d 86, 93). "Evidence is 'clear and convincing' if it is 'so clear, direct and weighty and convincing as to enable either a judge or jury to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.'" *Irvine v. City of Sioux Falls*, 2006 S.D. 20, ¶ 9, 711 N.W.2d 607, 610 (citation omitted).

[¶30.]     Significantly, because "[t]he right of visitation derives from the right of custody[,]" an award of visitation "is controlled by the same legal principles." *Clough*, 2008 S.D. 125, ¶ 15, 759 N.W.2d at 304 (first alteration in original) (citation omitted). *See also Aguilar*, 2016 S.D. 20, ¶ 18, 877 N.W.2d at 338–39. "Therefore, before a court may consider granting visitation, the non[-]parent must rebut the constitutional presumptions that are due a parent." *Beach v. Coisman*, 2012 S.D. 31, ¶ 8, 814 N.W.2d 135, 138 (citation omitted). Stated differently, if the non-parent does not rebut the "parent's presumptive right to custody and to control visitation[,]" the circuit court may not award custody or permanent visitation to a non-parent. *Id.*

[¶31.]       The circuit court concluded the Meliuses "failed to prove, by clear and convincing evidence, any extraordinary circumstances under SDCL 25-5-30." The Meliuses contend the circuit court erred in reaching that conclusion for several reasons. They argue that Lakota lacks basic parenting skills and that this caused B.M.'s diaper rashes and general state of uncleanliness. The Meliuses also rely heavily on the custody evaluator's recommendations. They argue that because they are bonded with B.M., "[b]reaking this bond would cause significant emotional harm to B.M., which is an extraordinary circumstance."

[¶32.]       The circuit court found "the diaper rashes significantly improved between March of 2023 and August of 2023. During this period, [B.M.] was in Lakota's custody at least four nights a week, demonstrating to the [c]ourt that Lakota was capable of addressing the diaper rashes." This finding is not clearly erroneous. The testimony established that Lakota became comfortable changing B.M.'s diapers and that the diaper rash problem had significantly improved. Teri Tracy, B.M.'s daycare provider, explained that the diaper rashes were "the worst [she's] ever seen." However, she also explained that at the time of the trial, the diaper rash problem had been alleviated. Similarly, Tori testified that when Lakota first started having overnight visits with B.M., the diaper rashes were particularly bad, but "recently in the last couple months it has gotten better." In his testimony, Lakota explained that he was initially hesitant to change B.M.'s diapers but was routinely changing B.M.'s diapers at the time of trial. Because the court's findings on this issue are not clearly erroneous, they provide the necessary support for its ultimate conclusion that the problems related to hygiene did not constitute an

extraordinary circumstance established by clear and convincing evidence as required by SDCL 25-5-30.

[¶33.] Throughout the proceedings, Lakota demonstrated his commitment to being a parent. On this point, the circuit court found that "Lakota's actions and growing maturity throughout these proceedings show a bond between him and [B.M.] and a willingness and effort to be [B.M.'s] parent." This finding is not clearly erroneous. Shortly after B.M. was born, Lakota was initially granted limited contact with B.M. However, Cheryl and the Meliuses eventually cut off all contact between Lakota and B.M. After Lakota established paternity and was granted visitation, he used that time to develop a bond with B.M. Lakota described how he spent his time with B.M. and explained that he understood the importance of feeding B.M. nutritious foods. Lakota also confirmed that he was enrolled in future parenting classes. The circuit court's findings have substantial support in the record. Despite the Meliuses' claim that Lakota lacks basic parenting skills, the circuit court's findings on this point demonstrate that this is not an extraordinary circumstance under SDCL 25-5-30. *Compare Veldheer*, 2012 S.D. 86, ¶¶ 26–27, 824 N.W.2d at 95–96 (reasoning that a father's willingness to be involved in a child's life and to grow as a parent weighed against finding extraordinary circumstances) *with Clough*, 2008 S.D. 125, ¶ 16, 759 N.W.2d at 304 (reasoning that a mother's absence in a child's life for four years weighed in favor of finding extraordinary circumstances).

[¶34.] The Meliuses assert that because they are bonded with B.M., she will suffer severe emotional harm if removed from their care. This Court rejected a similar argument in *Veldheer* and explained:

> Therefore, this is a case in which the evidence indicates that the distress of spending less time with [non-parents] would understandably impact the children. But, changes merely "impact[ing]" children are insufficient to constitute extraordinary circumstances resulting in serious detriment. *Beach*, 2012 S.D. 31, ¶ 9, 814 N.W.2d at 139. The distress children normally endure in changing custody is not in and of itself an extraordinary circumstance causing serious detriment within the meaning of SDCL 25-5-29(4) and SDCL 25-5-30.

2012 S.D. 86, ¶ 28, 824 N.W.2d at 96 (second alteration in original). B.M. is bonded with the Meliuses but is also bonded with Lakota, her biological father. This case is not a contest between equals. *Howlett*, 2018 S.D. 19, ¶ 14, 908 N.W.2d at 780. Unlike the Meliuses, Lakota has "a fundamental right to the care, custody, and control of [his child.]" *Id.* (citation omitted). The Meliuses' bond with B.M., by itself, cannot outweigh Lakota's fundamental right as a parent to the custody and control of his child.

[¶35.] The Meliuses also take issue with the circuit court's rejection of the custody evaluator's recommendation. They note the problems the custody evaluator perceived with Lakota's then-present ability as a parent. In assessing the custody evaluator's report and testimony, the circuit court explained that the evaluator's "analysis of Lakota's presumptive right to custody was inadequate . . . [because] she evaluated this case as if it was a custody dispute between natural parents and did not fully recognize Lakota's presumptive rights as the natural parent. She gave every benefit of the doubt to the [Meliuses]." The circuit court was not bound to

adopt the custody evaluator's recommendation, particularly in light of the evaluator's failure to account for Lakota's constitutional right as B.M.'s father. *See Kreps v. Kreps*, 2010 S.D. 12, ¶ 34, 778 N.W.2d 835, 845 ("There is no requirement in our case law for [circuit courts] to adhere to the recommendations in a custody evaluation."). The circuit court correctly oriented itself to the governing legal principles and appropriately analyzed the issue for itself. The circuit court's ability to weigh this testimony is entitled to "due regard." *Aguilar*, 2016 S.D. 20, ¶ 9, 877 N.W.2d at 336. From our de novo review of the record, the circuit court did not err in concluding there was no clear and convincing evidence of extraordinary circumstances under SDCL 25-5-30.

[¶36.] Turning to Lakota's first issue, he asserts that because the circuit court determined the Meliuses did not rebut the presumption that Lakota was entitled to custody, it erred when it awarded the Meliuses permanent visitation rights. He contends that because he was awarded sole legal and physical custody of B.M., he has sole discretion to decide whether any non-parent can exercise visitation with his child.

[¶37.] The circuit court, in three separate conclusions of law, determined the Meliuses did not rebut Lakota's presumptive right to custody by clear and convincing evidence. However, on the visitation issue, the court concluded the Meliuses satisfied their "initial burden of production that they have closely bonded [with B.M.] as a parental figure and formed a significant and substantial relationship with B.M." However, without a determination that there are extraordinary circumstances rebutting Lakota's presumptive right to control

visitation, the circuit court instead applied a "best interests" standard, stating, "It would be adverse to [B.M.]'s best interests for all contact with [the Meliuses] to cease, and there should be ongoing contact with them through a transition plan."

[¶38.] The circuit court ordered that "Miles and Tori shall have visitation with [B.M.] alternating weekends from Friday through Sunday and two overnights during the week as agreed upon by the parties until June 1, 2024[.]" After June 1, 2024, "the overnight visits during the week for Miles and Tori shall reduce to one overnight visit during the week, with the alternating weekend visitation to remain the same[.]" From October 1, 2024, "the overnight visit during the week for Miles and Tori shall be eliminated, with the alternating weekend visitation to remain the same[.]" Regarding holiday visitation, the circuit court ordered "that Miles and Tori and Lakota shall alternate holidays and birthdays pursuant to the South Dakota Parenting Guidelines[.]" Thus, under the circuit court's order, the Meliuses will continue to have visitation rights on alternating weekends, certain holidays, and birthdays.

[¶39.] Although dubbed a "transition plan," the court's visitation order grants the Meliuses permanent visitation. However, the Meliuses did not rebut, with clear and convincing evidence of extraordinary circumstances, Lakota's presumptive right as a custodial parent to control visitation with a nonparent. *See Clough*, 2008 S.D. 125, ¶ 15, 759 N.W.2d at 304 (reviewing whether extraordinary circumstances had been proven for a nonparent to obtain visitation). Lakota's fundamental right to parenthood therefore remains fully intact, and he may exercise all the liberties associated with it. *Troxel*, 530 U.S. at 65. Encompassed within that right is the

ability to make "the decision whether [B.M.'s relationship with a non-parent] would be beneficial in any specific case . . . in the first instance." *Id.* at 70. The circuit court's order directly preempts that right by effectively making that decision for him without a prerequisite finding of extraordinary circumstances.

[¶40.] In his trial testimony, Lakota explained that he did not believe the Meliuses should be denied all contact with B.M. When asked how much he thought the Meliuses should be with B.M., he explained, "I like them a lot, I think they're pretty cool people and all but I want to say like a weekend once a month[.]" As a parent, Lakota has the right to make such a choice. The circuit court lacked the authority to dictate visitation because it did not find clear and convincing evidence under either SDCL 25-5-29 or SDCL 25-5-30 to rebut Lakota's parental presumption. Until the parental presumption is rebutted, a best interest of the child assessment has no application in these circumstances. *See Veldheer*, 2012 S.D. 86, ¶ 31, 824 N.W.2d at 97 ("Because [non-parents] did not meet their high evidentiary burden in this kind of case, we may not consider the court's findings regarding the best interests of the children. It is only when a 'non-parent prevails, either on a claim of parental unfitness or extraordinary circumstances' that the best interests of the child test become applicable." (citation omitted)).

[¶41.] To award the Meliuses visitation, the circuit court must have determined that they rebutted Lakota's presumptive right as a parent to control visitation with a nonparent. *See Beach*, 2012 S.D. 31, ¶¶ 9–11, 814 N.W.2d at 139. Because the circuit court did not find extraordinary circumstances to rebut Lakota's presumptive parental rights, it erred when it awarded the Meliuses permanent

visitation rights. We affirm the circuit court's conclusion that the Meliuses failed to put forth clear and convincing evidence of extraordinary circumstances under SDCL 25-5-30. We reverse the circuit court's award of visitation to the Meliuses.

### 2. Whether the circuit court was clearly erroneous when it determined that Lakota's custody of B.M. would not result in serious emotional or physical damage under ICWA.

[¶42.] The circuit court concluded that "ICWA applies because Lakota is an enrolled member of the Tribe and, pursuant to the Tribe's law, [B.M.] is eligible for enrollment." Foster care placements are defined as "any action removing an Indian child from its parent or Indian custodian for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent or Indian custodian cannot have the child returned upon demand, but where parental rights have not been terminated[.]" 25 U.S.C. § 1903(1)(i). Third-party custody proceedings meet the definition of "foster care placements" under ICWA.[4]

[¶43.] Under 25 U.S.C. § 1912(e), the Meliuses needed to put forth clear and convincing evidence that B.M. would suffer severe emotional or physical damage in Lakota's custody. That statute provides: "No foster care placement may be ordered in such proceeding in the absence of a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." *Id.* Additionally, "the evidence

---

4. This interpretation of 25 U.S.C. § 1903(1)(i) finds support in decisions from other jurisdictions. *See In re Mahaney*, 51 P.3d 776, 782–83 (Wash. 2002); *O'Brien v. Delaplain*, 556 P.3d 1170, 1183 (Alaska 2024).

must show a causal relationship between the particular conditions in the home and the likelihood that continued custody of the child will result in serious emotional or physical damage[.]" 25 C.F.R. § 23.121(c). "Without a causal relationship . . . evidence that shows only the existence of community or family poverty, isolation, single parenthood, custodian age, crowded or inadequate housing, substance abuse, or nonconforming social behavior does not by itself constitute clear and convincing evidence . . . that continued custody is likely to result in serious emotional or physical damage to the child." 25 C.F.R. § 23.121(d). The circuit court found the Meliuses "failed to present clear and convincing evidence that continued custody by Lakota would result in serious emotional and physical damage to [B.M.]"

[¶44.] "A finding that continued custody is [or is not] likely to result in serious emotional or physical damage is reviewed for clear error." *People ex rel. A.A.*, 2021 S.D. 66, ¶ 40, 967 N.W.2d 810, 823 (citation omitted). "Under this standard of review, we will not set aside the circuit court's findings unless [we are] 'left with a definite and firm conviction that a mistake has been made.'" *Id.* (citation omitted).

[¶45.] For the most part, the Meliuses' arguments on this assignment of error mirror those in the previous section. They contend that "B.M. has endured physical detriment while in Lakota's care. B.M. has been subjected to physical pain because of Lakota's inability to provide basic proper parenting to B.M." To prove their argument, they point to "the continued, repeated incidents of neglect, and repeated incidences of [Lakota] putting B.M. in harm's way by Lakota's failure to use proper

car seats, failing to child proof his home, and his failure to understand why these things are issues[.]"

[¶46.] The Meliuses' ICWA expert witness, Luke Yellow Robe, concluded that custody should remain with the Meliuses. He opined that many of the issues raised by the Meliuses regarding Lakota's care of B.M. amounted to neglect. However, on cross-examination, he admitted that many of B.M.'s problems had been improving. In assessing Yellow Robe's testimony, the circuit court noted that "Yellow Robe gave serious weight to Medrano's affidavit, even though she did not testify at trial, and [he] gave little credit to Lakota as a parent even though [B.M.] had spent more than half the time with Lakota since September of 2022."

[¶47.] Conversely, Lakota's ICWA expert witness, Renee Bear Stops opined that "Lakota should be able to parent his child in a permanent capacity with the support of his extended family." Bear Stops acknowledged that the diaper rash issue was "concerning" but explained that with the help of his family and community, Lakota demonstrated the ability to improve. The circuit court determined that "Bear Stops was a credible witness[.]"

[¶48.] The record supports the circuit court's finding that the Meliuses failed to prove by clear and convincing evidence that Lakota's continued custody of B.M. would result in serious emotional or physical damage.

### 3. *Whether the circuit court erred when it ordered Lakota to use a specific daycare provider.*

[¶49.] Two specific provisions of the circuit court's order following the custody trial are pertinent to this issue: (1) "that [B.M.] shall continue to go to Terri [sic] Tracy's daycare in Winner until at least December 31, 2024, unless otherwise

agreed by the parties, with Lakota and [the Meliuses] sharing the cost of the daycare;" and (2) "that effective January 1, 2025, Lakota may move [B.M.] to a different daycare[.]" Lakota claims the circuit court's order requiring him to use a specific daycare provider violated his fundamental rights as B.M.'s father.

[¶50.] "It is well recognized that this Court renders opinions pertaining to actual controversies affecting people's rights." *In re Woodruff*, 1997 S.D. 95, ¶ 10, 567 N.W.2d 226, 228 (citation omitted). "A moot case is one in which there is no real controversy or which seeks to determine an abstract question which does not rest on existing facts or rights, with the result that any judicial determination would have no practical or remedial effect." *Netter v. Netter*, 2019 S.D. 60, ¶ 9, 935 N.W.2d 789, 791 (citation omitted). "[T]he continued existence of a controversy, pending the appeal, is essential to appellate jurisdiction." *Metzger v. Metzger*, 2021 S.D. 23, ¶ 10 n.1, 958 N.W.2d 715, 718 n.1 (alteration in original) (citation omitted). "Accordingly, an appeal will be dismissed as moot where, before the appellate decision, there has been a change of circumstances or the occurrence of an event by which the actual controversy ceases and it becomes impossible for the appellate court to grant effectual relief." *Woodruff*, 1997 S.D. 95, ¶ 10, 567 N.W.2d at 228 (citation omitted).

[¶51.] Lakota's requested appellate remedy is the reversal of the order requiring him to use the specified daycare provider. This portion of the circuit court's order expired on December 31, 2024. As of that date, Lakota was free to determine where B.M. would attend daycare. *See Lewis ex rel. E.L. v. Garrigan*, 2019 S.D. 38, ¶ 16, 931 N.W.2d 518, 524 (holding that the expiration of a protection

order during the pendency of an appeal rendered the appeal moot with no applicable exception). Accordingly, even if this Court were to determine this portion of the circuit court's order violated Lakota's fundamental rights as a parent, it "would have no practical or remedial effect." *Netter*, 2019 S.D. 60, ¶ 9, 935 N.W.2d at 791. Accordingly, we do not reach the merits of this issue because it is moot.

### 4. Whether the circuit court abused its discretion by ordering Lakota to pay attorney fees caused by the delay in the trial.

[¶52.] An award of attorney fees is reviewed for an abuse of discretion. *Hiller v. Hiller*, 2018 S.D. 74, ¶ 19, 919 N.W.2d 548, 554. "An abuse of discretion 'is a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary and unreasonable.'" *Id.* (citation omitted). "[A] trial court's decision based on an error of law can be by definition an abuse of discretion." *In re Fred Petersen Land Tr.*, 2023 S.D. 44, ¶ 26, 995 N.W.2d 84, 90 (alteration in original) (citation omitted).

[¶53.] Lakota argues that the circuit court abused its discretion in assessing attorney fees against him. His concern appears to relate to the circuit court's award of attorney fees resulting from his late disclosure of his tribal status. Although he mentions, in passing, the fees assessed against him related to the contempt citation, the entirety of his discussion focuses on the fees related to his late disclosure of his tribal status. Lakota does not challenge the reasonableness of the amount of fees imposed; instead, he argues that ICWA requires the party seeking a change in the custody of an Indian child (i.e., the Meliuses) to investigate the tribal enrollment of the parties to the suit. The Meliuses suggest that Lakota did not object to the

circuit court's proposed order and assert that he is precluded from raising this issue for the first time on appeal.

[¶54.]     Despite the Meliuses' claim, Lakota preserved this issue by making his theory known in his proposed findings of fact and conclusions of law. *See State v. Leigh*, 2008 S.D. 53, ¶ 21, 753 N.W.2d 398, 404 (concluding there was no waiver when a party "insert[ed] in its proposed findings of fact and conclusions of law" the theory it advanced on appeal). Specifically, Lakota proposed, "Lakota's tribal status was not brought to the [c]ourt's attention until shortly before the custody trial was scheduled the first time, which resulted in a delay of the trial. Fault for this delay should not be ascribed to Lakota because pursuant to [ICWA], it is the responsibility of the party seeking the involuntary placement of a child to consider whether ICWA may be applicable."

[¶55.]     In South Dakota, "the recovery of attorney's fees is governed by the American rule, which provides: 'each party bears the party's own attorney fees. However, attorney fees are allowed when there is a contractual agreement that the prevailing party is entitled to attorney fees or there is statutory authority authorizing an award of attorney fees.'" *Credit Collection Servs., Inc. v. Pesicka*, 2006 S.D. 81, ¶ 6, 721 N.W.2d 474, 476 (quoting *Crisman v. Determan Chiropractic, Inc.*, 2004 S.D. 103, ¶ 26, 687 N.W.2d 507, 513). The provisions of ICWA do not provide authority for an award of attorney fees.

[¶56.]     However, under SDCL 15-17-38, "[t]he court, if appropriate, in the interests of justice, may award payment of attorneys' fees in all cases of divorce,

annulment of marriage, determination of paternity, *custody*, *visitation*, separate maintenance, support, or alimony." (Emphasis added.)

[¶57.] "This Court has consistently required trial courts to enter findings of fact and conclusions of law when ruling on a request for attorney fees. Without findings of facts and conclusions of law there is nothing to review." *Goff v. Goff*, 2024 S.D. 60, ¶ 28, 12 N.W.3d 139, 150 (citation omitted). "Generally, the failure to file findings of fact and conclusions of law constitutes reversible error." *Toft v. Toft*, 2006 S.D. 91, ¶ 11, 723 N.W.2d 546, 550 (citation omitted).

[¶58.] "However, we have also noted that an appellate court may remand for findings, or, because findings are not jurisdictional, 'an appellate court may decide the appeal without further findings if it feels it is in a position to do so.'" *Id.* (citation omitted). "[T]o determine whether we are in a position to review a ruling that is not supported by findings and conclusions," a review of the purposes of findings of fact is helpful:

> The purpose of findings of fact is threefold: to aid the appellate court in reviewing the basis for the trial court's decision; to make it clear what the court decided should estoppel or res judicata be raised in later cases; and to help [en]sure that the trial judge's process of adjudication is done carefully.

*Id.* ¶ 12 (citation omitted). Accordingly, "[t]he appellate court may decide the appeal without further findings if '(1) the record itself sufficiently informs the court of the basis for the trial court's decision on the material issue, or (2) the contentions raised on appeal do not turn on findings of fact.'" *Id.* (citation omitted).

[¶59.] Here, although the circuit court awarded the Meliuses attorney fees stemming from Lakota's late disclosure of his tribal enrollment, it entered only one

finding related to its attorney fee ruling: "Lakota . . . did not disclose his tribal status to the [Meliuses] until July 25, 2023, which was three days before the first scheduled custody trial date. As a result of the late disclosure, the trial had to be rescheduled to provide proper notice to the Tribe under ICWA." Similarly, when the circuit court gave its oral decision, it explained, "Lakota was clearly in the best position to inform of his tribal status and he failed to do so. This has resulted in delay of the trial." However, the circuit court did not cite SDCL 15-17-38 or any of our decisions addressing an award of attorney fees in these circumstances.

[¶60.] Nonetheless, given the nature of Lakota's claim on appeal, we are in a position to decide the appeal. First, "the record itself sufficiently informs the court of the basis for the trial court's decision[.]" *Toft*, 2006 S.D. 91, ¶ 12, 723 N.W.2d at 550 (citation omitted). The circuit court viewed it as Lakota's responsibility to disclose his tribal status. It awarded attorney fees that resulted from the delay of the proceedings because it perceived fault in the timing of Lakota's disclosure.

[¶61.] Second, Lakota's claim on appeal does not turn on specific and detailed findings of fact. *Id.* Lakota argues that, under 25 U.S.C. § 1912(a), the Meliuses had the burden to recognize and establish that ICWA applied to this case. 25 U.S.C. § 1912(a), in part, provides:

> In an involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention.

Lakota's reliance on that statute is misplaced. That statute presupposes that the circuit court has made a preliminary determination "that an Indian child is involved[.]" *Id.* It then imposes notification responsibilities on the party seeking the foster care placement. However, the statute does not support Lakota's claim that the Meliuses needed to make the initial inquiry about whether the case involved an Indian child or to prove that ICWA was implicated.

[¶62.] The federal regulations related to ICWA place the initial responsibility to inquire into the potential applicability of ICWA on the court exercising jurisdiction in the foster care or termination of parental rights proceeding. *See* 25 C.F.R. § 23.107(a). That regulation provides that the court should "ask each participant . . . whether [they know or have] reason to know that the child is an Indian child." *Id.* Moreover, this inquiry should be made "at the commencement of the proceeding[.]" *Id.* Clearly, the circuit court did not make this inquiry at any time before Lakota disclosed his tribal status.

[¶63.] Attorney fees awarded under SDCL 15-17-38 must be "in the interests of justice[.]" The attorney fees the circuit court ordered Lakota to pay related to the additional cost of litigation incurred by the Meliuses caused by the delay in the proceedings. The circuit court incorrectly perceived that Lakota had a burden to disclose his tribal enrollment status and had caused the delay by failing to satisfy that burden. Instead, no delay would have occurred if the inquiry specified in 25 C.F.R. § 23.107(a) had occurred at the beginning of the proceedings. The circuit court's misperception resulted in an attorney fee award that was not "in the interests of justice" and was an abuse of discretion. *See In re Fred Petersen Land*

*Tr.*, 2023 S.D. 44, ¶ 38, 995 N.W.2d at 92 (concluding that a circuit court's "erroneous view" of an applicable statute in assessing a request for attorney fees was an abuse of discretion).

[¶64.]     The circuit court's assessment of attorney fees related to Lakota's tribal enrollment status is reversed.  Lakota did not appeal the circuit court's award of attorney fees for his willful violation of the circuit court's order to continue using the same daycare provider.  The circuit court awarded $3,992.59 in total attorney fees but did not specify how much was attributable to the contempt finding.  We reverse the portion of the award attributable to the tribal enrollment status and remand to the circuit court to determine the amount of the attorney fee award that was attributable to the contempt finding.

[¶65.]     SALTER and DEVANEY, Justices, concur.

[¶66.]     JENSEN, Chief Justice and KERN, Justice, concur in part and dissent in part.

JENSEN, Chief Justice (concurring in part and dissenting in part).

[¶67.]     I concur in all respects with the majority opinion, except as to Issue 4. I would affirm the circuit court's order requiring Lakota to pay attorney fees as a proper exercise of the court's discretion.

[¶68.]     Following the trial, the circuit court ordered Lakota to pay $3,992.59 in attorney fees to the Meliuses, based upon his willful violation of the court's order to use the same daycare provider as the Meliuses and his delay in asserting the applicability of ICWA, which caused the trial to be postponed.  Lakota does not dispute the reasonableness of the attorney fees nor does he dispute the attorney fees

attributable to the contempt finding. As such, the majority opinion correctly recognizes that the portion of the fees attributable to the contempt finding should be upheld.

[¶69.] I would also affirm the circuit court's award of attorney fees relating to the delay in the proceedings as a proper exercise of the court's discretion. *See Taylor v. Taylor*, 2019 S.D. 27, ¶ 15, 928 N.W.2d 458, 465 ("[W]e employ the abuse of discretion standard when reviewing a grant or denial of attorney fees.").

[¶70.] The Meliuses commenced their action for custody on May 27, 2022. Lakota appeared through counsel on May 31 and objected to a June 7 hearing set to determine temporary custody. Lakota did not, however, disclose that he was enrolled in the Rosebud Sioux Tribe or that B.M. was eligible for enrollment. Over the next year, the parties litigated this case without Lakota mentioning the potential applicability of ICWA. In May 2023, the parties scheduled a trial for July 26 and 27, and again, Lakota failed to make any mention of the applicability of ICWA.

[¶71.] There is no doubt that the court and the Meliuses would have learned of Lakota's tribal membership and that B.M. was an Indian child had the court inquired into their status at the beginning of the case. But that did not happen. Nonetheless, Lakota waited until the day of trial to file a motion to dismiss on the basis of ICWA noncompliance. And it was this late filing, after the trial had been scheduled for more than 60 days, that resulted in the continuance of trial.[5] Based

---

5.    The circuit court found Lakota did not disclose his tribal enrollment until "three days before the first scheduled custody trial date." The trial docket

(continued . . .)

upon Lakota's unreasonable delay in filing the motion to dismiss raising the issue of ICWA noncompliance, the court acted well within its discretion in faulting Lakota for the need to postpone the trial and ordering him to pay the Meliuses' attorney fees incurred as a result of the delay. *See Hiller v. Hiller*, 2018 S.D. 74, ¶ 32, 919 N.W.2d 548, 557 (explaining that the second prong for awarding attorney fees under SDCL 15-17-38 "requires consideration of the parties' relative worth, income, liquidity, *and whether either party unreasonably increased the time spent on the case.*" (Emphasis added)).

[¶72.]     For these reasons, I would affirm the circuit court's assessment of attorney fees against Lakota for the contempt finding and for causing the trial to be delayed.

KERN, Justice (concurring in part and dissenting in part).

[¶73.]     I concur in part and dissent in part to the holdings in the majority opinion. In my view, the portion of the circuit court's order providing the Meliuses with visitation rights as part of a transition plan granting them alternating weekends, certain holidays, and birthdays with B.M. should be affirmed. Undoubtedly, in crafting such an order, the court was attempting to provide for the child's emotional well-being, stability, and safety by maintaining this continuing contact with the child's aunt and uncle while she moved into the full-time care of her father. In light of the unique facts of this case and the evidence in the record, in

---

(. . . continued)
shows that Lakota filed his motion to dismiss and brief arguing ICWA noncompliance on the morning of July 26, 2023—the first day of trial. The Meliuses filed a brief regarding the application of ICWA later that afternoon.

my view, the court erred by not finding extraordinary circumstances to rebut the presumption of unrestricted custody with Lakota so as to permit visitation while the child made the adjustment. Although the court erroneously used the best interests of the child standard to analyze the question, I would affirm the court's interim visitation schedule as being well within its discretion and supported by the extraordinary circumstances present in this record. *See Aggregate Constr. Inc. v. Aaron Swan & Assocs., Inc.*, 2015 S.D. 79, ¶ 14 n.3, 871 N.W.2d 508, 512 n.3 ("[A] [circuit] court may still be upheld if it reached the right result for the wrong reason.").

[¶74.] Specifically, the record supports a finding that extraordinary circumstances under SDCL 25-5-30(4) and (8) were proven by clear and convincing evidence. First, under SDCL 25-5-30(4), the evidence presented by the Meliuses established "[t]he existence of a bonded relationship between the child and the person other than the parent sufficient to cause significant emotional harm to the child in the event of a change of custody." Perhaps the most compelling, and largely undisputed, evidence on this point was the detrimental effect on B.M. when Lakota abruptly removed her from daycare. Teri and Tori testified that after B.M. was removed from daycare, she began hitting, eating her diaper, and exhibiting withdrawn behavior. The circuit court appears to have adopted the position that B.M.'s removal from daycare was the cause of these negative behaviors.

[¶75.] The evidence also established that this child would be detrimentally impacted by the loss of the Meliuses and experience much more than "[t]he distress children normally endure in changing custody[.]" *See Veldheer v. Peterson*, 2012

S.D. 86, ¶ 28, 824 N.W.2d 86, 96 (citation omitted). After being removed from daycare, B.M. began regressing behaviorally even though she continued to attend Teri's daycare two days per week during the time she was in the Meliuses' care. It is not difficult to infer the serious detriment that could result from a complete loss of contact with the Meliuses. As evidenced by the circuit court's findings and order continuing visitation, it was concerned about the negative impact on B.M. if all contact with the Meliuses was cut off. Based on the evidence presented, the circuit court could have found extraordinary circumstances under SDCL 25-5-30(4).

[¶76.] Additionally, the testimony during trial calls into question the "likely degree of stability and security in the child's future with the parent." SDCL 25-5-30(8). As noted above, Lakota abruptly removed B.M. from daycare, which was a stable source of care for her as she moved between Lakota's home and the Meliuses'. The circuit court acknowledged that this decision had a negative impact on B.M. Further, while this matter was ongoing, Lakota inserted more instability into B.M.'s life by beginning a new relationship with Medrano, introducing B.M. to Medrano, and then subsequently ending the relationship. During this time, Lakota and Medrano had a child, introducing a half-sibling into B.M.'s life while Lakota was still learning how to properly care for B.M. The court set forth a schedule of decreasing visitation as the child adjusted to full time care in her father's home to alleviate the stress caused by the change and to keep intact the child's relationship with her aunt and uncle. In my view, the record was more than sufficient to justify a finding of extraordinary circumstances under SDCL 25-5-30(8) by clear and

convincing evidence and the circuit court erred by failing to make the appropriate finding.

[¶77.]    It is evident that the circuit court was oriented towards ensuring B.M.'s emotional stability and security throughout this process. Although the majority opinion notes that the visitation order was permanent in nature, visitation orders are always subject to modification in the best interests of the child which is necessitated by the changing circumstances of the parties and the child as she grows and develops over time. SDCL 25-4-45. Nothing in the order precluded the parties from seeking to modify the visitation as needed.

[¶78.]    Regarding the court's order requiring Lakota to pay the Meliuses' attorney fees, I join the majority's conclusion that Lakota should not be required to pay that portion of the Meliuses' attorney fees related to the late disclosure of his membership in the Rosebud Sioux Tribe and the subsequent one-month delay in order to notify the Tribe of the proceedings under ICWA. I agree that it is the circuit court's responsibility to inquire regarding the status of the Indian child.[6] Indeed, 25 C.F.R. § 23.107(a), requires that the court inquire of the participants in an emergency, voluntary, or involuntary child-custody proceeding "whether the participant knows or has reason to know that the child is an Indian child." The court did not make this timely inquiry. I also agree with the majority that Lakota is responsible for the attorney fees assessed against him in the contempt

---

6.    "'Indian child' means any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4).

proceedings. The matter must be remanded for the court to determine what portion of the fee award is attributable to the contempt proceedings versus the failure to timely disclose his tribal membership.

[¶79.]     While the majority's decision reverses the circuit court's order of visitation between the Meliuses and B.M., there is nothing prohibiting Lakota from acting in the best interest of B.M. by allowing her to have contact with loving relatives on *both* sides of her family. Hopefully, all parties can get past their fears of "losing" B.M., earnestly respect and cooperate with each other, and by doing so, allow her to experience a joyful childhood filled with relatives who deeply care for her and want to lavish their love and affection on her.